In the Matter of the Application for the DISCIPLINE OF Thomas J. AGNEW, II, an Attorney at Law of the State of Minnesota.

No. 51290.

Supreme Court of Minnesota.

Nov. 6, 1981.

Michael Hoover, Administrative Director on Professional Responsibility, Lawyers Professional Responsibility Bd., St. Paul, for the Bd.

Thomas Agnew, Duluth, pro se.

PER CURIAM.

This disciplinary proceeding arises out of two petitions, filed at the direction of the Lawyers Professional Responsibility Board (LPRB) on May 20, 1980, and December 24, 1980. There are nine complaints in all, covering a period from November 1978 to October 1980. These nine complaints encompass a wide range of disciplinary rule violations, including fraudulent conduct, representation outside the bounds of law, breaches of confidentiality, and improper withdrawal from employment. Respondent has, in the course of his legal practice, caused unnecessary expense and annoyance to the courts, his fellow attorneys, and his own clients. The cumulative weight and severity of the violations compel us to order disbarment.

This matter comes to us with findings, conclusions, and the recommendation of Referee Ben F. Grussendorf, who heard testimony offered by the LPRB on February 23 and 24, 1981. Neither party having ordered a transcript of the hearing within 5 days, the referee's findings and conclusions are conclusive in this proceeding, pursuant to Rule 14(d), Rules on Lawyers Professional Responsibility. We note that respondent chose not to appear at the hearing; rather, he caused a motion to quash subpoena to be delivered to the referee before the hearing. We disapprove of this uncooperative conduct, particularly because it was upon respondent's motion that venue was transferred to Duluth for the convenience of witnesses he proposed to call. Nevertheless, the sanction we impose is based solely upon the violations alleged and proved by the LPRB.

I. The Violations

It is unnecessary to recount every element of each complaint and the more than a score of disciplinary rule violations found by the referee. It will suffice to discuss the most serious infractions, which lead us to conclude that respondent is unfit and lacks competence to continue as a member of the legal profession.

In January 1979, respondent was consulted by a client facing three pending misdemeanor charges. Respondent advised his client that he had "49 options"—he should flee the state—and thereby prejudiced the administration of justice and counseled a client in known illegal conduct. DR 1–102(A)(5) and DR 7–102(A)(7).

In February 1979, while participating as plaintiff and attorney *pro se* in a civil defamation suit, respondent filed a motion attempting to join the attorney for several opposing parties as a defendant in the suit. Respondent's grounds for the motion were so weak that the referee concluded it was made without a good faith argument, merely to harass or maliciously injure the opposing attorney. DR 7–102(A)(1) and DR 7–102(A)(2).

A clergyman sought legal advice from respondent in September 1979 relating to a sensitive issue of threatened defamation against the clergyman by a parishioner. Roy Anderson, a nonlawyer, was at this time an associate of respondent in the North Central Commodity Transfer Association, an organization formed for the benefit of independent truckers. Anderson was introduced to the clergyman as merely an "associate," and respondent failed to inform the clergyman that he had a right to exclude Anderson from the interview.

The clergyman discussed his problem with respondent for about 15 minutes, when Anderson interrupted and commenced an uninvited religious lecture to the clergyman, lasting 30–45 minutes. At the end of this session, the clergyman was told he would be charged $15 for respondent's legal advice but owed nothing for Anderson's lecture. Three weeks later, after respondent was notified of a professional ethics complaint against him arising out of this interview, respondent billed the clergyman an additional $45 for the meeting. This episode is found to have violated the client's confidences, prejudiced the administration of justice, and adversely reflected on respondent's fitness to practice law. DR 4–101(B)(1), DR 1–102(A)(5), and DR 1–102(A)(6).

A fourth complaint involves respondent's conduct during closing argument in a misdemeanor vehicle weight case tried January 23, 1980. Representing the defendant, respondent attempted to obtain an acquittal in a manner which impugned the integrity of the court and implied a conspiracy between the prosecutor, the police, and the presiding judge.[1] These statements, made in a court of law, are prejudicial to the administration of justice, adversely reflect on respondent's fitness to practice law, are allusions to irrelevant and unsupported matters, and constitute undignified and discourteous conduct. DR 1–102(A)(5), DR 1–102(A)(6), DR 7–106(C)(1), and DR 7–106(C)(6).

A fifth complaint refers to respondent's conduct in representing the defendant in a civil suit. The suit was commenced on July 28, 1980, and respondent served an answer and counterclaim on behalf of the defendant on August 14, 1980. But respondent failed to respond to discovery requests that had been served with the summons and complaint. The plaintiff's attorney voluntarily extended the time for responding, while renewing his discovery requests, until September 19, 1980, when he noticed for October 6, 1980, hearing a motion to compel responses and for attorney fees incurred in bringing the motion.

Respondent then served answers to the requests, but these were incomplete and did not conform to the Minnesota Rules of Civil Procedure. On September 25, 1980, the plaintiff's attorney again noticed for October 6, 1980, hearing a motion to compel discovery. These motions were heard without an appearance by respondent. The court ordered full and complete answers by October 20, 1980, and assessed costs and attorney fees of $150 against the defendant. Respondent failed to respond.

1. Respondent warned the jury that the prosecutor, the arresting officer, and the judge "will attempt to direct your thinking towards the technicalities of this case * * *. [T]he court may not permit me to get to the real issues of this case." Later respondent said, "And this police officer, instead of going out there to help [defendant], went out there to make the arrest so that he can collaborate with the Prosecutor and the Court personnel * * *." After being found in contempt for the above comments, respondent concluded, "[Y]ou see the kind of a country we have. And I ask you to return the verdict of not guilty to show that this kind of thing cannot take place in this country."

Finally, on November 12, 1980, the plaintiff was granted a motion to strike respondent's answer and for summary judgment.[2] Respondent had failed to appear at the hearing on these motions too. On November 21, 1980, respondent filed a notice to remove the judge from the case. On December 11, 1980, judgment was entered against the defendant for $3,061.31 damages, $3,061.31 as reasonable attorney fees, and for double costs and disbursements.

Respondent's representation here constituted neglect of a matter entrusted to him, resulted in prejudice and damage to his client, was an intentional violation of established rules of procedure, and prejudiced the administration of justice. DR 6–101(A)(3), DR 7–101(A)(3), DR 7–106(C)(7), and DR 1–102(A)(5).

The most egregious behavior documented in these petitions involves respondent's conduct following an initial consultation with Jerry and Sandra Karppinen in January 1980. The Karppinens brought documents to respondent which they believed were evidence of underpayment by a company that leased their trucks. These documents were left with respondent for him to review and recommend a course of action. No copies were in existence.

Later that day, Mr. Karppinen told respondent to discontinue representing him and compute the charges for respondent's time. Karppinen said he would pay his bill and retrieve his documents 2 days later. Karppinen went to respondent's office at the appointed time and was told that an invoice had not yet been prepared but would be sent the following week. Respondent said he would hold the documents until the invoice was completed.

The following week, Karppinen phoned respondent's office and was told by Roy Anderson that the documents were unavailable because they had been given to the United States Justice Department for investigation of possible criminal charges. The next day, January 30, 1980, Karppinen again demanded his documents from respondent. Respondent offered to negotiate a retainer agreement at a reduced percentage from what they had discussed at the initial consultation but refused to return the documents.

On February 2, 1980, respondent commenced an action entitled *Jerry Karppinen v. Dale Kirscher, et al.,* in St. Louis County District Court. The Karppinens neither knew of nor consented to the suit, in which respondent falsely alleged that Karppinen had lost sleep and become sexually impotent and temporarily deranged due to the defendant's actions.

On February 6, 1980, respondent presented a petition for appointment of guardian ad litem in the *Kirscher* matter. Attached to the petition was respondent's affidavit alleging that he was Jerry Karppinen's attorney and that Karppinen had been threatened or coerced by an unknown source, had become incoherent in speech, and was too emotionally unstable to fulfill his responsibilities as a party in the matter. Respondent filed the petition without Karppinen's knowledge or consent and without obtaining a medical opinion of Karppinen's condition. A guardian was appointed pursuant to the petition on February 6, 1980, but respondent failed to serve a copy of the order upon Karppinen until March 5, 1980.

By this time, the Karppinens had retained separate counsel to assist in recovering the documents. Their attorney, Daniel H. Mundt, made several requests for the documents. On February 19, 1980, Mundt's law firm commenced an action for the Karppinens against respondent for return of the documents.

---

2. In a memorandum with its order, the court said it "has no way of knowing if there is any merit to the defendant's general denials in his answer or counterclaim against the plaintiff. But because defendant's counsel has failed, for whatever reasons, to represent the defendant within the framework of the Rules of Civil Procedure, the court feels it has no alternative but to grant plaintiff's motion. * * *. The court has no knowledge about the relationship between the defendant and attorney Agnew but certainly Mr. Agnew's failure to comply with the rules and orders of the court has been at least irresponsible if not in fact contemptuous."

A third lawsuit was commenced on February 27, 1980. In that action, *North Central Commodity Transfer Association v. Mundt and Hall,* respondent falsely pleaded that Karppinen had given him the documents during an investigation of the trucking industry by North Central Commodity Transfer Association. The suit was an attempt to enjoin the Karppinens' new lawyers from retrieving the documents.

When the Agnew matter came on for hearing on February 29, 1980, on an order to show cause, Judge Charles T. Barnes of the St. Louis County District Court ordered respondent to deliver the documents by March 6, 1980. Respondent filed a notice of appeal on March 5, 1980, and failed to comply with the order. It was not until a March 13 hearing concerning all three lawsuits that respondent returned the documents to the Karppinens. Even then, respondent continued to pursue the *Kirscher* matter through a writ of prohibition to this court. This writ sought to restrain the St. Louis County District Court from dissolving the appointment of the guardian ad litem for Karppinen. Respondent failed to appear for the prehearing conference, and the writ was denied.

Because of respondent's action, Karppinen incurred legal bills of approximately $8,000 and lost substantial time appearing in court and meeting with his attorneys merely to obtain the return of documents left with respondent on January 24, 1980. Respondent violated the requirement of mandatory withdrawal following discharge by a client and used a confidence to his client's disadvantage and for the advantage of himself or a third party. DR 2–110(B)(4), DR 4–101(B)(2), and DR 4–101(B)(3). He engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, advanced unwarranted claims without good faith arguments, and created affidavits known to be false. DR 1–102(A)(4), DR 7–102(A)(2), and DR 7–102(A)(6). His actions in obtaining a guardian ad litem reflect a lack of fitness to practice law and

a failure to avoid potential conflict of interest. DR 1–102(A)(6) and DR 5–101(A). And, by bringing the suit on behalf of North Central Commodity Transfer Association, Inc., of which he was general counsel, respondent accepted employment which impaired his independent professional judgment in behalf of the Karppinens. DR 5–105(A) and DR 5–105(C).

## II. The Sanction

This summary of the referee's findings and conclusions does not detail each element of every complaint, nor does it cite all of the code violations of which respondent is guilty. Yet, the recitation is sufficient to indicate not only an ethical dereliction on the part of respondent but also a deficiency in professional judgment and competence. We have given careful consideration to the nature of respondent's misconduct and the extent of the harm he has caused the public and the legal profession. In selecting the appropriate sanction, we endeavor to protect the public from future harm and to preserve the legal profession's most precious resource—public confidence in the judicial system. *See In re Rerat,* 232 Minn. 1, 63–64, 44 N.W.2d 273, 304 (1950).

We conclude that the proper sanction is disbarment. Respondent has demonstrated, by his actions related herein, that he is unfit to continue as a member of the legal profession. By voluntarily refusing to take part in the referee's hearing, respondent has left the record bare of any mitigating circumstances. There is nothing in the record that allows us to identify the source of his misconduct in any "mental or psychological aberration or pressures which were transitory and susceptible of correction." *See In re Ossana,* 288 Minn. 541, 542, 180 N.W.2d 260, 261 (1970) (footnote omitted).

Respondent has failed to persuade us that he considers himself obliged by his oath to come up to the standards set by the canons of ethics. *See In re Peterson,* 260 Minn. 339, 345, 110 N.W.2d 9, 13 (1961). He has exhibited little, if any, appreciation of the

needless harm and distress he has caused others, particularly the Karppinens.[3]

Upon this record, and in light of respondent's attitude toward his wrongdoing and the canons of ethics, he is hereby disbarred.

YETKA, J., took no part in the consideration or decision of this case.

---

**3.** Respondent, in his appearance before this court, asserted in defense of his conduct that Jerry Karppinen "received a better portion of [respondent's] efforts in the legal practice for an entire period of 2 months and didn't pay [respondent] one dime." Unlike respondent, we view respondent's efforts as being at cross-purposes with the Karppinens and being the direct cause of the $8,000 in legal fees which the Karppinens incurred trying to regain their documents.