In the Matter of the Petition for DISCI-PLINARY ACTION AGAINST Duane FRANKE, a Minnesota Lawyer.

No. C6–82–315.

Supreme Court of Minnesota.

Feb. 17, 1984.

Tierney, Norton, Krieser & Helgen, P.A., Paul D. Tierney, Minneapolis, for respondent.

Michael J. Hoover, Director of Lawyers Professional Responsibility Board, William J. Wernz, Atty., St. Paul, for appellant.

PER CURIAM.

This petition for disciplinary action, filed at the direction of the Lawyers Professional Responsibility Board (LPRB) on March 15, 1982, raises serious and distressing charges. Respondent, admitted to the practice of law in Minnesota in 1958, undertook directly and through Estate Management Corporation (EMC), the corporate fiduciary which he owned and directed, to act as guardian and attorney for numerous elderly persons and their modest estates. EMC handled over 300 small estates, most of them in Hennepin County.

The petition contains 16 counts of violations of disciplinary rules which occurred from 1973 through 1979 with regard to respondent's discharge of his and his corporation's guardianship obligations in a number of cases. During that time respondent was an officer and shareholder in the firm of Franke, Anderson, Ardery and Davern, Ltd. At the present time he maintains a solo practice.

Referee David E. Christensen conducted a 4-day hearing on the matter. The referee's findings and conclusions, issued March 8, 1983, specified wide-ranging disciplinary

rule violations including self-dealing, intentional harm to two wards, misrepresentations to the probate court, assessing excessive fees and charging against wards' accounts, and the unauthorized practice of law. Because neither party ordered a transcript of the hearing, the referee's findings of fact and conclusions are conclusive. Rule 14(d), Rules on Lawyers Professional Responsibility. On the entire record before us and for the reasons set out below, we order disbarment.

## I. THE VIOLATIONS.

We will discuss in detail only the most serious of respondent's disciplinary violations, those which arose out of his handling of the estates of four wards: Anastasia Mee, Elise Mason, Eva Kline and Vernen Johnsen. With regard to appellant's conduct concerning these wards and their estates, the referee made the following findings:

GUARDIANSHIP OF ANASTASIA B. MEE. In 1974, respondent was retained by Francis Mee to establish a guardianship for his mother, Anastasia Mee, who opposed the establishment of the guardianship and specifically opposed the appointment of either EMC or Francis Mee as guardian. On February 4, 1975, EMC was appointed guardian of the estate of Anastasia Mee. Respondent acted as attorney for EMC in the guardianship but did not at any time communicate with or meet with Anastasia Mee. In July 1975, EMC sold Mee's homestead at 5408 Elliott Avenue South, Minneapolis, to John D. Anderson and Janis Anderson on contract for deed for the appraised value of $29,500 without advertising the sale or taking bids. Neither EMC nor respondent revealed to the probate court that "John Anderson" was the "John D. Anderson" associated with respondent in the practice of law and in representing EMC in its fiduciary capacity on numerous occasions, or that "Janis Anderson" was EMC vice-president known to the probate court as "Janis Louise Schultz." EMC charged the Mee estate a real estate sales commission of five percent of the $29,500, though neither EMC nor respondent had

performed any services for the fee. EMC filed the annual account including this commission, which was included in "Guardian Fees" without further identification, 4 years later in August 1979. EMC filed a report of the sale, falsely representing that EMC was not directly or indirectly interested. At respondent's direction and without court approval, EMC made an unsecured loan of $2,000 in guardianship funds to Francis Mee, who made no payments on the loan although he was gainfully employed. Respondent observed but made no objection when Francis Mee testified at a probate court hearing that he was paying "about $25 a month" on the loan. EMC made no substantial efforts to collect the loan and allowed the statute of limitations to run while Anastasia Mee became a medical assistance recipient. EMC also distributed household goods of the ward valued at $700 to Francis Mee without court approval.

GENERAL CONSERVATORSHIP OF ELISE B. MASON. On March 2, 1976, EMC was appointed general conservator of the person and estate of Elise B. Mason by the Ramsey County Probate Court. Mason, an 89-year-old woman desiring to remain in her home, required assistance in caring for herself. To that end, the Ramsey County Adult Protection Services and respondent agreed that EMC would take charge of the person of Mason and see that her personal needs were met. Mason remained in her home until February 14, 1977. She was not a welfare recipient. EMC arranged to receive her Social Security, railroad retirement and other income. EMC was to provide a monthly living allowance of $150 to Mason. Instead, EMC provided only a $75 monthly allowance and that only for the months of May, June, July, August, October and December 1976. During those months three different persons at EMC were responsible for the Mason conservatorship. From January through August 1977 a fourth EMC employee, a 19-year-old whose only previous employment was as a cashier and secretary, was placed in charge of Mason. No one from EMC saw or contacted Mason

from January 1, 1977, through the termination of the conservatorship in September 1977. No monthly living allowance or personal needs monies were transferred to Mason by EMC at any time in 1977. Throughout that time Mason had personal property in the approximate amount of $50,000, income of $10,000 and bank deposits of $25,000.

On February 14, 1977, the social worker assigned to her case found Mason unconscious and with severely ulcerated skin. She had been unable to move or to summon help for several days. She was hospitalized. The doctor's report concluded that Mason would be permanently disabled, primarily as a result of malnutrition. On March 24, 1977, Mason was transferred to Parkway Manor Nursing Home. She was clothed by nursing home personnel in clothing obtained from a deceased nursing home resident.

During the entire period of the conservatorship, EMC failed to care for Mason's estate. Mason's home was trash-filled and rodent-infested. The bathroom plumbing did not work. Three thousand dollars in cash and $2,000 in checks were found in her unoccupied home. EMC did not carry insurance on her home or file for the 1977 homestead exemption.

In September 1977, EMC resigned as conservator of the Mason estate. EMC's final account included these payments: Duane Franke, attorney fees, $645.50; EMC, guardian fees, $1,894.93; Thomas Davern, attorney fees, $55.00; Elise Mason, personal needs, $450.00.

GUARDIANSHIP OF EVA L. KLINE. On April 10, 1973, respondent was appointed guardian of both the person and estate of Eva Kline. At that time Kline owned a fourplex at 2511 Nicollet Avenue South in Minneapolis, valued in the guardianship petition at $40,000. On the September 1974 inventory and appraisal form, Stan Larson and Vince Olson, appraisers, valued the property at $26,000, assuming a cash sale. The estimated market value for 1973 and 1974 tax assessment purposes was $36,000, a valuation which respondent made no effort to reduce. A July 1975 insurance policy showed the insurable value of the fourplex to be $31,250. The land was worth an additional $12,000. First Bloomington State Bank, at the same time, considered the property worth $20–25,000.

On March 10, 1975, respondent, as guardian, entered into a purchase agreement with Thomas Giese for private sale of the property for $19,000 on a contract for deed. The agreement gave Giese a right of first refusal to buy the contract for deed at a discount of 35% of the unpaid balance. This right the parties expected to be and was exercised by Giese as an option for a $13,400 cash sale, an amount the referee found to be an unreasonably low price. The court confirmed the sale on May 12, 1975, on the basis of a false reappraisal signed by Larson and Olson and notarized by respondent. Larson and Olson had signed blank reappraisal forms earlier, and respondent had inserted the $13,400 reappraisal figure without their knowledge or consent. Respondent charged the estate a sales commission of five percent of $19,000 but reported it to the court as part of "Attorney and Guardian Fees—Duane Franke—$1,327" on an annual account filed 4 years later in July 1979. There was no request for advertising, request for bids, open house or public notice of the offering of the house for sale. Respondent made no effort to sell the contemplated contract for deed to anyone but Giese, and no actual contract for deed was ever signed.

Though respondent was general guardian of the person of Eva Kline, he never contacted her or arranged to have anyone else do so. Kline was restored to capacity on a self-petition on June 6, 1980.

CONSERVATORSHIP OF VERNEN JOHNSEN. In mid-1977, EMC was named general conservator of the estate of Vernen Johnsen. On October 24, 1978, Johnsen signed a will drafted for him by respondent. The will included a devise to Janis Louise Anderson of 50% of Johnsen's residuary estate. EMC or, in the alternative, respondent was named personal representative. As previously indicated, Janis

Louise Anderson was the wife of respondent's law associate and was vice-president of EMC. The referee found that "Respondent did not advise Johnsen or insist to him that another attorney should draft Johnsen's will. Respondent did not advise Johnsen that Respondent's drafting of the will could jeopardize Johnsen's testamentary intentions."

OTHER FINDINGS. In addition to causing the particular harms described above, respondent engaged in repeated types of unethical conduct. He and EMC assessed realty commissions against wards' accounts which were clearly excessive in light of the services performed. Respondent notarized appraisal forms which had been signed in blank. Respondent and EMC repeatedly failed to file probate documents and annual guardianship accounts. Thus, probate courts in both Hennepin and Ramsey Counties were required to demand the necessary reports. EMC's inadequate and improper accounting resulted in a civil lawsuit brought by the Hennepin County prosecutor's office on behalf of nine estates. This suit was settled in April 1982, with respondent returning $25,000 to those estates.

The referee further found that respondent's wife, Deanna Franke, was president and sole shareholder of Heritage Sales, Inc. Heritage Sales was established to sell personal property for the estates of which EMC was the guardian. Heritage Sales normally charged a commission · of one-fourth to one-third of the gross sales or a $250 minimum. In numerous instances, respondent and his family purchased items while, at the same time, Heritage Sales charged a commission for the sale against the estate. At no time did EMC disclose to the probate court that the purchasers were related parties.

Finally, the referee found that both respondent and John Anderson had performed legal work for EMC when, at the same time, respondent was the owner of EMC and John Anderson was his associate.

The referee concluded that respondent's conduct, as detailed in the findings, constituted:

## I. SELF–DEALING

A. Purchases by Respondent and his family of estates' assets, sales by Respondent's wife and her corporation of estates' assets for fees without disclosure to the Court, purchase by Janis Schultz and John D. Anderson without disclosure of their homestead from the Mee estate and Respondent's drafting of EMC's conservatee Vernon Johnsen's will without appropriate advice violated DR 1–102(A)(5) and (6), DR 5–104 and DR 7–102(A)(3), Minnesota Code of Professional Responsibility, hereinafter MCPR.

## II. NEGLECT AND LACK OF ZEALOUS REPRESENTATION

A. Respondent through EMC neglected and failed to zealously represent the person and estate of Elise B. Mason in violation of DR 6–101(A)(3), MCPR. With respect to looking after Mason's person and her home, Respondent's failures amount to an intentional failure to seek her lawful objectives and damage to a client during the professional relationship, in violation of DR 7–101(A)(1) and (3), MCPR.

B. Respondent neglected and failed to zealously represent the person and estate of Eva Kline, in violation of DR 6–101(A)(3). His procedures with respect to sale of Kline's fourplex were so seriously deficient as to amount to an intentional failure to seek her lawful objectives and damage to a client during the professional relationship, in violation of DR 7–101(A)(1) and (3), MCPR.

C. Respondent neglected and failed to zealously represent the estate of Anastasia Mee, in violation of DR 6–101(A)(3).

D. Respondent's and EMC's repeated failures to file such probate documents as inventories and annual accounts in a timely fashion violated DR 1–102(A)(5) and DR 6–101(A)(3), MCPR.

### III. MISREPRESENTATION, CONCEALMENT AND LACK OF CANDOR

A. Respondent's completion of the Kline re-appraisal without the knowledge or consent of the appraisers violated DR 1–102(A)(4), (5) and (6), DR 7–102(A)(3), (5) and (6), MCPR.

B. Respondent's practices regarding notarizations were improper, particularly in the notarization of re-appraisals that as a common matter had been signed in blank, in violation of DR 1–102(A)(4), (5) and (6), MCPR.

## IV. EXCESSIVE FEES AND CHARGES

A. Respondent's and EMC's realty commissions were clearly excessive charges in those instances, including the Kline and Mee estates, in which the guardian performed little or no service for the commission, in violation of DR 2–106, MCPR.

## V. UNAUTHORIZED PRACTICE OF LAW

A. Respondent's receipt of attorney fees from EMC while he was an officer and employee of EMC, and EMC's payment of attorney fees to John D. Anderson while he was associated with Respondent violated MINN.STAT. § 481.02, Subd. 5.

## II. THE SANCTION.

The only question for this court to decide is what disposition of the matter is required on the record before us. We are concerned that the referee's recommendation for discipline is less than we feel obliged to impose. We place great weight upon the referee's recommendation but are not bound by it. The final responsibility for determining appropriate discipline rests solely with this court. *In re Daly*, 291 Minn. 488, 490, 189 N.W.2d 176, 179 (1971). We say again, as we said in *In re Daly*, "Since lawyers are granted a monopoly to perform legal services for hire, * * * they, like all monopolies, must be subject to strict regulation with respect to admission to practice and to the performance of professional services, as well as to public accountability for adherence to the rule of law, canons of ethics, and standards of professional responsibility." 189 N.W.2d at 178. We must judge respondent's fitness to continue in the practice of law by the ancient and fundamental standards of professional conduct as set forth in the Canons of Professional Ethics and the Code of Professional Responsibility. We do not seek to punish respondent but to protect the public from possible future harm. *See In re Rerat*, 232 Minn. 1, 5, 44 N.W.2d 273, 275 (1950). To that end we weigh carefully the nature of the misconduct, the cumulative weight of the disciplinary rule violations, the harm to the public, and the harm to the legal profession. *In re Agnew*, 311 N.W.2d 869, 872 (Minn.1981).

Respondent's misconduct contravened one of the most fundamental concepts of his profession: that he should represent his clients competently and zealously, without prejudice or damage to those clients. His neglect of the affairs of Elise Mason and Eva Kline was so complete that the referee concluded that it "amount[ed] to an intentional failure to seek [their] lawful objectives * * * in violation of DR 7–101(A)(1) and (3)." We condemn in strongest terms respondent's virtual abandonment of Elise Mason, with its life-threatening consequences. Where, as here, an attorney exhibits callous disregard for the physical and financial well-being of vulnerable, dependent persons, that attorney has a heavy burden to persuade the court of his fitness to continue the practice of law.

The cumulative weight of respondent's disciplinary rule violations is obvious upon

summarizing the referee's report. EMC handled approximately 300 small estates. The record in the present matter concerns 15 of those estates, or approximately five percent of EMC's fiduciary accounts. Heritage Sales handled approximately 30 sales of personalty. Of these, 15 sales were to family members, for the bulk of which Heritage Sales charged commissions of one-fourth to one-third of gross sales. EMC handled 15 real estate sales. Of these, seven transactions were the subject of the Hennepin County lawsuit or of this disciplinary matter. The referee concluded that respondent's actions involved self-dealing, intentional harm to two wards (Mason and. Kline), neglect of and failure to zealously represent other wards, failure to file probate documents in a timely fashion, improper notarizations, falsifying a reappraisal, charging excessive fees for which he performed little or no service, and representing clients notwithstanding the ever-present conflict of interest of EMC's profitability.

Respondent has harmed specific individuals. There is a less tangible, yet no less real, harm to the public-at-large that occurs when an attorney's conduct is the subject of negative media attention. Publicity of attorney misconduct may discourage those needing legal assistance from seeking it.

Finally, concerning harm to the legal profession, the record is replete with instances in which the probate courts in both Hennepin and Ramsey Counties had to order respondent to submit the required legal documents. Delays were common. Special explanations were required. Accountings were denied. Estates remain improperly accounted for to date. Respondent's falsification of affidavits and concealment of related-party dealings from the probate court constitute a major violation of his duties as an officer of the court. We conclude that, absent mitigating factors, the appropriate discipline is disbarment.

In his defense, respondent asserts that he has already been severely punished. The notoriety from the media coverage has cost him both clients and his law partners.

Respondent further asks that consideration be given to his previously unblemished record, his public service, and his cooperation with the Lawyers Professional Responsibility Board.

■ This court will take into account an attorney's unblemished record, *In re Prescott*, 271 N.W.2d 822 (Minn.1978), community service, and full cooperation with the Board of Professional Responsibility investigation. *Matter of Shaw*, 298 N.W.2d 133 (Minn.1980). But these factors do not militate against the imposition of discipline in matters of serious ethical misconduct. *In re Nelson*, 327 N.W.2d 576, 577 (Minn.1982) (officer or chairman of several community organizations; law professor).

■ We turn to respondent's second argument. He contends that EMC was performing a valuable service, that to keep EMC viable it was necessary to keep costs down, and that some of his decisions to not "run up attorney's fees and guardianship fees" are judgment errors only with the benefit of hindsight. This argument clearly must fail. In considering mitigating factors, this court looks for an appreciation by respondent of the harm he has caused others and evidence that he considers himself obligated to conform to the canons of ethics. *In re Agnew*, 311 N.W.2d at 872; *In re Scallen*, 269 N.W.2d 834 (Minn.1978). We observe with deep regret the virtually complete absence in respondent of an appreciation of the harm he has caused to clients and of the degree by which his conduct has failed to meet this state's professional standards. "Professional morality, because of the fiduciary position occupied by the attorney, necessarily exacts higher standards of conduct." *Matter of Peterson*, 274 N.W.2d 922, 925 (Minn.1979).

■ We conclude that the range of respondent's misconduct including breach of fiduciary trust, the cumulative weight of his violations of the Code of Professional Responsibility, the continuing nature of the violations over a lengthy period of time, the harm to specific individuals and to the public-at-large, and the continuing waste of

precious court resources calls for imposition of severe discipline. *In re Agnew.* Mitigating factors, including evidence that he considers himself obligated to conform to the canons of ethics, are not present. We hold that the proper disciplinary sanction in this matter is disbarment. Such action is consistent with applicable precedent. *In re Quello,* 338 N.W.2d 31 (Minn. 1983); *In re Agnew,* 311 N.W.2d 869. Respondent must be, and hereby is, disbarred.

Disbarred.

COYNE, J., took no part in the consideration or decision of this matter.