**In the Matter of the Application for the DISCIPLINE OF John T. BENSON, an Attorney at Law of the State of Minnesota.**

No. C5–87–1989.

Supreme Court of Minnesota.

Nov. 4, 1988.

Candice M. Hojan, Office of the Lawyers Professional Responsibility, St. Paul, for appellant.

Jack S. Nordby, Minneapolis, for respondent.

## OPINION

PER CURIAM.

This petition for the discipline of respondent John T. Benson raises serious charges of misappropriation of an elderly client's funds through the use of invalid documents and subsequent conspiracy with a second attorney to alter the documents and present perjured testimony to make the documents appear valid. We have already dealt with aspects of the case in the disciplinary proceeding of the second attorney. *In re Kaine*, 424 N.W.2d 64 (Minn.1988). We now address the disciplinary petition brought against the instigating attorney and order his disbarment.

Respondent was admitted to the Minnesota bar in 1978. On November 10, 1987, this court temporarily suspended his license to practice law pending the outcome of the disciplinary proceeding. The petition and two supplementary petitions filed by the Director of the Board of Professional Responsibility on September 24, November 6 and December 4, 1987, allege eleven counts of misconduct which occurred between 1984 and the present time, while respondent was acting as attorney and trustee for an elderly client, Vivian Young.

A four-day hearing was held before a referee. The director called 23 witnesses and submitted numerous documentary exhibits. The respondent did not testify but thoroughly cross-examined witnesses and submitted depositions of two witnesses of his own. On February 22, 1988 the referee issued findings of fact, conclusions of law and a recommendation for discipline. The referee found the respondent had:

1) drafted documents to benefit himself without adequate disclosures, informed consent or independent legal counsel, in violation of DR 1–102(A)(6), DR 5–101(A) and DR 7–101(A)(3) of the Minnesota Code of Professional Responsibility (MCPR);

2) misappropriated client funds in violation of DR 1–102(A)(4) and (6), DR 7–101(A)(3), DR 9–102(A) and (B), MCPR, and Rules 1.15(a) and (b), 1.7(b) and 8.4(c), Minnesota Rules of Professional Conduct (MRPC);

3) made false certification to the Supreme Court regarding trust funds in violation of DR 1–102(A)(4) and DR 9–104(B) MCPR and Rules 1.15(h) and 8.4(c) MRPC;

4) induced a client through undue influence and fraudulent misrepresentation to sign a trust agreement drafted for his own benefit in violation of Rules 1.8(a) and (c) and Rule 8.4(c) MRPC;

5) violated fidiciary duties in forgiving his own debt, in violation of Rules 1.7(b) and 8.4, MRPC;

6) refused to account for assets in violation of Rules 1.15(b), 3.1, 3.4(a) and (d) and 8.4(d) MRPC;

7) altered and fabricated documents in violation of Rule 3.4(a) and Rules 8.4(a), (c) and (d) MRPC;

8) made false statements under oath in violation of Rules 3.3(a), 3.4(b), 8.1(a) and Rules 8.4(b), (c) and (d) MRPC;

9) conspired to alter documents and give false testimony, in violation of Rule 3.4(b) and Rules 8.4(a), (b), (c) and (d) MRPC;

10) failed to timely file income tax returns in violation of DR 1–102(A)(5) and (6) MCPR and Rule 8.4(d) MRPC;

11) failed to provide copies of his tax returns to the Director's office or to execute authorizations, violating Rule 8.1(a)(3) MRPC and Rule 25, Rules on Lawyers Professional Responsibility (RLPR);

12) falsely notarized a power of attorney in violation of DR 1–102(A)(3) and (4) and DR 7–102(A)(8) MCPR;

13) used the falsely notarized document in violation of DR 1–102(A)(4) and (6) MCPR and Rules 4.1 and 8.4(b) and (c) MRPC;

14) presented the falsely notarized document to the Director's office in violation of Rules 3.4(b), 8.1(a)(1) and 8.4(d) MCPR;

15) impeded the Director's investigation by concealing evidence of the alteration of the Young Trust in violation of Rules 3.4(a) and 8.4(b), (c) and (d) MRPC; and

16) failed to comply strictly with the terms of his temporary suspension in violation of Rule 26 RLPR, and Rules 3.4(c),

8.1(a)(3) and 8.4(d) MRPC. The referee found the lack of a previous disciplinary record to be the only mitigating factor. The referee recommended disbarment and assessed costs, disbursements and $2,800 in attorney fees against respondent.

■ Respondent ordered a transcript on March 1, 1988. Thus the referee's findings are not conclusive under Rule 14(e), RLPR. It is for us to determine whether the evidence supporting those findings of fact meets the clear and convincing standard of proof. *In re Schmidt,* 402 N.W.2d 544, 545 (Minn.1987). We have described this standard as requiring cogent and compelling evidence. *Id.*

■ Respondent filed a brief with this court, admitting the alteration of documents but insisting that the original documents were valid transfers of assets and reflected the wishes of Vivian Young. Less than one month after filing that brief, respondent pled guilty in Ramsey County Court to one felony count of theft by swindle and one felony count of perjury in a seven count felony complaint which arose out of his dealings with Vivian Young's assets. His sentences were stayed on condition that he serve one year in the workhouse with ten years' active probation and pay restitution in the amount of $207,000 to Vivian Young's guardian. Under Rule 19(a), RLPR, these convictions are conclusive evidence that respondent committed the conduct for which he was convicted. In addition, our careful review of the evidence presented at the hearing leads us to affirm the findings of the referee.

■ This case graphically presents a lawyer's capacity to do injury to vulnerable members of the public who rely on the lawyer in the handling of their assets. Vivian Young and her husband, John, were long-time family friends of the respondent. Just before John Young died of cancer on August 9, 1984, he asked respondent to care for Vivian's needs after his death. Purportedly as part of that arrangement, respondent drafted a September 1, 1984 agreement, signed by himself and Vivian Young. The agreement indicated that respondent was to care for Mrs. Young and

would receive the bulk of her estate at the time of her death. Respondent also drafted an addendum to this agreement, dated September 10, 1984, although the date was not filled in until after June 25, 1987. This addendum appeared to give him the right "to use all assets of Vivian Young as they were his own," despite the lack of additional consideration. Vivian Young and respondent both signed this addendum.

Respondent drafted a power of attorney dated September 17, 1984, giving him the power "to sign for Vivian Young in all her financial matters." Vivian Young signed the power of attorney, which was purportedly notarized on September 17, 1984. The notarization stamp, issued in the name of William Bell, had been altered so as to obliterate the year, disguising the fact that the notary's commission had expired on February 27, 1984. William Bell did not notarize the document and the stamp was found in respondent's possession. A handwriting expert testified that the signature of the notary on this document was not the handwriting of William Bell but was consistent with respondent's handwriting. Respondent did not disclose to Vivian Young his adverse interests, nor did he arrange for independent counsel when drafting these three documents in his own interest.

Under the purported authority of these documents, respondent placed over $174,000 of Vivian Young's funds into his trust account between September 17, 1984 and April 27, 1987. Respondent loaned $40,000 of this money on an unsecured basis to a business associate, and loaned himself over $130,000 from Vivian Young's assets, but could not produce the promissory notes.

In 1984, 1985 and 1986, while respondent was appropriating these funds through his trust account, he falsely certified to this court that he did not handle client funds and so was exempt from the trust account rules.

In March 1987, Vivian Young broke her hip and was hospitalized. At that time her attending physician gave her a secondary diagnosis of senile dementia. She was placed in Trevilla nursing home to recuper-

ate on April 13, 1987. During the period she resided at Trevilla, Vivian Young remained confused, sometimes becoming convinced that her husband was still alive, or that she was somewhere else than in the nursing home. During this time, respondent drafted a trust agreement placing all her assets in trust for the benefit of respondent, who was also named trustee. Respondent had Vivian Young sign the agreement on April 28, 1987, while she was incompetent, without benefit of independent counsel. Respondent represented the document as relating to her care, though as drafted, once the assets of Vivian Young were placed in trust they could not be used for her care but only for the benefit of respondent. After Vivian Young had signed the agreement, respondent manufactured two new pages, on June 25, 1987, naming his wife and children as trust beneficiaries and creating a schedule of assets to be included in the trust. Without a schedule, the document signed by Vivian Young was ineffective and could not transfer assets to the trust. Nevertheless, under the purported authority of the trust agreement, respondent transferred into the trust the promissory notes he had signed indicating he had borrowed $130,000 from Vivian Young. Then as trustee, he forgave the debt and destroyed the notes, cancelling his obligation to repay that money.

On April 30, 1987, respondent opened an account at Western State Bank titled "Vivian G. Young Trust," deposited over $32,000 of Vivian Young's funds, and then appropriated those funds to his own use. On June 18, 1987, or shortly thereafter, respondent unsuccessfully attempted to have Vivian Young sign the series HH bonds he had removed from her safe deposit box, in order to sell the bonds. Respondent had already taken the other contents of the safe deposit box to his home, along with all Vivian Young's silver and silverplate from her townhouse.

A cousin of Vivian Young's, Marian MacMillan, became concerned at the state of Vivian's finances. Marian MacMillan was appointed temporary guardian on June 18, 1987, and proceeded to file a civil suit against respondent, seeking an accounting and return of assets. Respondent appeared at a deposition and refused to disclose any financial information, claiming attorney-client privilege protected the disclosure of Vivian Young's financial status to her guardian. Marian MacMillan was appointed guardian of Vivian Young's person, and First National Bank of Stillwater was appointed guardian of the estate. To date, we have no indication respondent has yet provided an accounting of Mrs. Young's assets.

Soon after respondent received notice that the Office of Professional Responsibility was investigating several complaints filed against him, he contacted an attorney acquaintance from law school, J. Timothy Kaine. On July 24, 1987, respondent met with Kaine and told Kaine that he was having a problem of "appearance of conflict" on a trust. Respondent induced Kaine to sign statements added to the September 1, 1984 agreement, the Addendum and the Young Trust which stated the documents had been prepared by Kaine. The two men then prepared corroborating stories. Respondent went so far as to drive Kaine past Vivian Young's house and to take him to Trevilla Nursing Home to meet her, so that Kaine could be convincing when he testified to drafting the documents. Respondent gave two false depositions to the Board of Professional Responsibility and Kaine gave one indicating that Kaine had drafted all the documents and served as independent counsel for Vivian Young. This deception was exposed when Kaine approached the Director's office on September 19, 1987 to confess.[1] When faced with Kaine's confession, respondent admitted to the alteration of documents. Respondent did not cooperate with the investigation against him, but continued to impede the work of the Director's office by confiscating bills for word processing which indicated the Young Trust was altered after it was signed by Vivian Young.

---

1. Kaine has since been suspended indefinitely by this court, without leave to apply for read-mission for five years. *In re Kaine*, 424 N.W.2d 64, 66 (Minn.1988).

In addition to the extensive misconduct described above, respondent failed to file individual income tax returns for 1982–1986 until late 1987, after the Office of Professional Responsibility had made several requests for the returns, and did not cooperate with the Director's requests to provide the returns.

Finally, respondent failed to comply strictly with the terms of his temporary suspension. He did not promptly notify two clients that he could not represent them, and continued to hold himself out as an attorney by not removing his name from the building directory and by allowing his phone to be answered "Benson Law Offices."

Respondent's actions in this case involved a pattern of misconduct and were taken for dishonest and selfish motives against a particularly vulnerable victim. This demonstrates a callous disregard for the letter and spirit of a lawyers' ethical duties. As we stated in *In re Daly*, 291 Minn. 488, 490, 189 N.W.2d 176, 178 (1971) "Since lawyers are granted a monopoly to perform legal services for hire, * * * they, like all monopolies, must be subject to strict regulation with respect to admission to practice and to the performance of professional services, as well as to public accountability for adherence to the rule of law, canons of ethics, and standards of professional responsibility." We judge respondent's actions in light of these standards not to punish him but to protect the public from possible future harm. *See In re Rerat*, 232 Minn. 1, 5, 44 N.W.2d 273, 275 (1950). To that end we weigh carefully the nature of the misconduct, the cumulative violations, the harm to the public, and the harm to the legal profession. *In re Agnew*, 311 N.W.2d 869, 872 (Minn.1981).

We note with disapprobation that respondent's misconduct was directed against an elderly, dependent person who was not only a client but a lifelong friend, with the ties of affection that attend such a relationship. This relationship, which respondent has characterized as almost a mother-son relationship, did not prevent respondent from appropriating a substantial portion of Vivian Young's assets. The general public, with no such relationship, would hardly be protected from similar misconduct.

We are not convinced respondent has demonstrated a desire to correct the wrongs he has caused or that he even appreciates the wrongfulness of his behavior. Before pleading guilty to the criminal charge of theft by swindle, respondent asserted to this court that he had done no wrong because Vivian Young, ill, incompetent, and residing in a nursing home, wanted him to have all her money. Such an argument merely indicates that respondent remains blind to the ethical duty he owed as a fiduciary to Vivian Young. "Professional morality, because of the fiduciary position occupied by the attorney, necessarily exacts higher standards of conduct." *In re Peterson*, 274 N.W.2d 922, 925 (Minn. 1979). Respondent's refusal to admit to wrongdoing led him to falsify documents and to perjure himself as well as to expose his law school colleague to discipline. The potential harm to the legal system, as well as to the public, that may be caused by a lawyer who fails to respect the principles of the system is evident.

In the past we have found disbarment to be appropriate in cases where attorneys have appropriated clients funds, *e.g. In re Parks*, 396 NW.2d 560, 563 (Minn.1986); *In re Selb*, 395 N.W.2d 81, 82 (Minn.1986). In this respect, this case perhaps most closely resembles *In re Olson*, 358 N.W.2d 662, 663 (Minn.1984), in which the attorney drafted documents in his own interest, transferring property belonging to his comatose sister-in-law. He afterwards refused to account for property of her estate and then left the jurisdiction to prevent probate of the estate. *Id.* at 664. This court is now faced with more egregious behavior. The breach of fiduciary trust, the cumulative weight of the violations of the Rules of Professional Responsibility, the continuing violations and the attempts to conceal them, and the willful disregard of the principles of the legal system call for the imposition of severe discipline. Mitigating factors, including evidence that respondent considers himself bound by the canons of ethics and intends to conform to them, are

absent. *In re Franke*, 345 N.W.2d 224, 230 (Minn.1984). We hold the appropriate sanction in this case to be disbarment.

The imposition of attorney fees upon a lawyer who is sanctioned must be considered carefully. Imposing costs may become an onerous burden, especially after the sanction has limited the attorney's ability to earn income to pay the fees. The imposition of costs, disbursments and attorney fees must not be used to penalize lawyers for defending themselves in good faith against charges of ethical violations.

The referee assessed $2,800 in attorney fees against respondent. While this is perhaps a large sum, it is based solely on the time spent by the Director's office between July 6 and September 24, 1987, while respondent was offering altered documents and perjured testimony as truth. The Director's office was forced to spend over 50 hours of attorney time, plus 13 hours of legal assistant time, in order to penetrate the falsehoods respondent insisted on offering. As such, the attorney fees do not reflect the total cost of prosecuting the respondent and so are not a penalty for offering a good faith defense, but are a deterrent to deliberate misrepresentations to the board.

For these reasons, we hereby order that respondent be, and hereby is, disbarred, and that costs, disbursements and $2,800 attorney fees be assessed against him.

So ordered.