**In re Petition for DISCIPLINARY ACTION AGAINST Thomas G. HARRIGAN, a Minnesota Attorney, Registration No. 132378.**

**No. A13–0542.**

Supreme Court of Minnesota.

Jan. 8, 2014.

---

Martin A. Cole, Director, Timothy M. Burke, Senior Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, MN, for petitioner.

Thomas G. Harrigan, Savage, MN, pro se.

## OPINION

PER CURIAM.

On March 12, 2013, the Director of the Office of Lawyers Professional Responsibility (OLPR) filed a petition for disciplinary action against Thomas G. Harrigan. The petition alleged that Harrigan's misappropriation of funds from and misrepresentations to his former client L.S. constituted professional misconduct. The petition also alleged that Harrigan's misrepresentations to the Director and failure to cooperate during the disciplinary investigation were acts of professional misconduct. On April 8, 2013, the Director filed a supplementary petition for disciplinary action against Harrigan. The supplementary petition added three new counts of professional misconduct, including additional misappropriation from L.S., misappropriation from former client

N.W., and additional failure to cooperate during the disciplinary investigation. Although Harrigan filed an answer to the original petition, Harrigan's answer was stricken due to his multiple failures to respond to discovery. The allegations in the petitions were then deemed admitted. On June 25, 2013, a referee conducted a hearing on these petitions, which Harrigan did not attend, and issued findings of fact, conclusions of law, and a recommendation for discipline. The referee recommended, and the Director agrees, that Harrigan be disbarred.

## I.

Harrigan was admitted to the practice of law in Minnesota on October 30, 1981. He has not been the subject of any prior discipline. The misconduct at issue arose from Harrigan's representation of two separate clients, L.S. and N.W., and Harrigan's subsequent failure to cooperate with the OLPR.

### A. L.S. Matter

Harrigan represented L.S. in her capacity as personal representative of the estate of Rita Kotrba. At the time she retained Harrigan, L.S., a former secretary with a high school education, was approximately 75 years old. As the personal representative, L.S. received a check for $125,857.35 from CNA Financial Corporation in December 2009 for the proceeds from Kotrba's Individual Retirement Account (IRA). L.S. gave this check to Harrigan, who then deposited the funds in his trust account. In addition to serving as personal representative of the estate, L.S. had been designated as the beneficiary of the IRA proceeds, and thus the funds were held in trust for her. In March 2010, L.S. requested a check to pay for income taxes on the CNA funds, and Harrigan paid L.S. $25,000 from the IRA proceeds. This was the only money L.S. ever received from the IRA proceeds, as Harrigan, without L.S.'s knowledge or consent, paid the remaining $100,857.35 entirely to himself over the next two years. Harrigan, who was not entitled to the funds, never provided L.S. with an accounting of the funds.

In approximately April 2011, Harrigan received a redemption check from Vanguard, an investment firm, payable to "THOMAS G. HARRIGAN ADM EST RITA KOTRBA," in the amount of $6,938.29 for the proceeds of one of Kotrba's accounts. Harrigan, who did not inform L.S. that he received these funds, subsequently deposited them into his trust account. By December 2011, Harrigan had paid all of the Vanguard funds to himself without the knowledge or consent of L.S. Again, Harrigan was not entitled to the funds and never provided L.S. with an accounting.

Beginning in late 2011, Harrigan falsely told L.S. that a claim had been made against her regarding the distribution of Kotrba's assets, and that he could not make any distributions to her from the CNA funds because the account was frozen. Harrigan also falsely told L.S. that he was attempting to arrange to arbitrate the claim and that the claimants were represented by a lawyer from another state. Around August 2012, L.S. retained new counsel. Her new counsel repeatedly attempted to contact Harrigan by phone and mail, requesting documentation of the purported claim that led to freezing of the account and the delayed distribution of the CNA funds. Harrigan initially provided a few documents from his representation of L.S., but did not supply documents relating to the claim, and did not release the CNA funds. Except for his initial and entirely inadequate response, Harrigan never responded to substitute counsel's repeated requests for documentation.

Based on these events, the referee found that Harrigan had misappropriated over $106,000 of L.S.'s funds. L.S. testified before the referee that this theft had caused her substantial stress, and that the money taken would have been helpful to her and her husband. Harrigan, who did not appear at the referee hearing or submit a brief in this proceeding, has not acknowledged misappropriating the funds and has not made restitution.

### B. *N.W. Matter*

Harrigan represented N.W. in a personal injury matter related to a 2008 automobile crash. At the time N.W. retained Harrigan, she was a 20–year–old student and had not been involved in any legal matters. Harrigan received $72,000 from Wisconsin Mutual as a settlement for N.W.'s personal injury claim. Harrigan deposited these funds into his trust account. N.W. and Harrigan had agreed that his fee would be one-third of the settlement, and on April 30, 2010, Harrigan disbursed $24,000 of the settlement funds to himself in payment of this fee. Harrigan told N.W. that he would hold the remaining funds in his trust account while he negotiated with medical providers.

On June 4, 2010, Harrigan disbursed $24,000 of the settlement funds to N.W., but he told her that the negotiations with medical providers were taking longer than expected and that N.W.'s insurer was attempting to recover some of the funds. On September 27, 2010, Harrigan paid $439.20 to an anesthesiologist on N.W.'s behalf, leaving $23,560.80 in the trust account. Thereafter, Harrigan proceeded to pay the remaining balance directly to himself without N.W.'s knowledge or consent. Harrigan was not entitled to these funds. N.W. attempted to contact Harrigan about the balance of her settlement, but he did not respond to her requests for informa-tion. Based on these events, the referee found that Harrigan deprived N.W. of nearly $24,000. N.W. testified that these events have caused her to lose trust in others.

### C. *Misrepresentations to and Failure to Cooperate with the OLPR*

On October 1, 2012, the Director of the OLPR mailed Harrigan a notice of investigation into L.S.'s complaint and requested that Harrigan appear at the Director's office on October 12 with documentation including L.S.'s file and statements for the trust account. Harrigan did not appear for the meeting, so a second notice was sent, requesting Harrigan's appearance on October 18. Harrigan attended this meeting and provided a response to the complaint, in which he stated that the funds at issue were not misappropriated but, rather, were for payment of attorneys' fees. The referee found that this was a false statement. Harrigan's document production to the Director was limited and incomplete; he did not provide the entire client file, nor did he supply bank statements or records related to the distribution of the CNA funds, such as the trust account check register, the client retainer agreement, or trust account books. Between November 2012 and March 2013, the OLPR issued five requests for information regarding deposits in the trust account and N.W.'s added complaint, but Harrigan did not respond to any of these requests. Because Harrigan failed to cooperate with discovery, the allegations against him were deemed admitted.

The referee noted, "[Harrigan] has offered no defense in this matter other than unsupported general assertions in his answers. He has by his conduct effectively abandoned any opposition to the allegations of the petitions and declined to participate in this proceeding." The referee

found that Harrigan had violated Minn. R. Prof. Conduct 1.4(a)(3) and (4),[1] 1.15(a), 1.15(c)(3) and (4),[2] 4.1,[3] and 8.4(c) and (d)[4] in his representation of L.S., and Minn. R. Prof. Conduct 1.4(a)(3) and (4), 1.15(a), 1.15(c)(3) and 8.4(c) and (d) in his representation of N.W. The referee also concluded that Harrigan violated Minn. R. Prof. Conduct 8.1(a) and (b) and Rule 25 of the Rules on Lawyers Professional Responsibility (RLPR) by his conduct during the disciplinary investigation.[5]

The referee concluded that Harrigan caused serious and substantial harm to his clients by his misconduct, and that his misconduct was aggravated by several factors, including his substantial experience in the practice of law, his selfish motive, his lack of recognition or acknowledgment of his wrongdoing, his lack of remorse, his indifference to making restitution, the vulnerable nature of his victims, and his failure to cooperate with the disciplinary proceedings. The referee then recommended that Harrigan be disbarred. The referee also recommended that Harrigan be immediately suspended pending resolution of this proceeding, and we suspended Harrigan on August 6, 2013.

## II.

■ Because neither party ordered a transcript of the proceedings, the referee's findings and conclusions are conclusive under Rule 14(e), RLPR. *In re Fru*, 829 N.W.2d 379, 387 (Minn.2013). The referee recommended that Harrigan be disbarred, and the Director agrees. Although we give "great weight" to the referee's recommendation, we retain the ultimate responsibility for determining the appropriate sanction. *In re Rebeau*, 787 N.W.2d 168, 173 (Minn.2010).

■ The purpose of disciplinary sanctions for professional misconduct is "not to punish the attorney but rather to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *Id.* The four factors that guide our imposition of discipline are: "(1)

1. Minnesota Rule of Professional Conduct 1.4(a)(3) and (4) requires that a lawyer shall "keep the client reasonably informed about the status of the matter" and "promptly comply with reasonable requests for information."

2. Rule 1.15 governs a lawyer's duties regarding the safekeeping of clients' property, including client funds, and subsection (a) requires that all funds of clients "shall be deposited in one or more identifiable trust accounts" and that, with limited exceptions not applicable here, funds belonging to the lawyer shall not be deposited in the trust account. Rule 1.15(c)(3) and (4) provides that a lawyer must maintain complete records of all funds of a client in the possession of a lawyer and "render appropriate accounts to the client" regarding them, as well as "promptly pay or deliver to the client or third person as requested the funds, securities, or other properties in the possession of the lawyer which the client ... is entitled to receive."

3. Rule 4.1 requires that "a lawyer shall not knowingly make a false statement of fact or law" in the course of representing a client.

4. Rule 8.4(c) and (d) describes professional misconduct as engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation" or "in conduct that is prejudicial to the administration of justice."

5. Minnesota Rule of Professional Conduct 8.1 states that lawyers shall not "knowingly make a false statement of material fact" in connection with a disciplinary matter or "knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority," other than for information protected by Rule 1.6, which is not applicable here. Rule 25, RLPR, provides, among other things, that it is the duty of any lawyer who is the subject of an investigation or proceeding under the rules to cooperate with the Director by complying with reasonable requests for information.

the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." *In re Fru,* 829 N.W.2d at 388 (citation omitted) (internal quotation marks omitted). Aggravating and mitigating circumstances are also considered. *Id.* We look to similar cases for guidance as to the discipline to impose, but the discipline is tailored to the specific facts of each case. *Id.*

### A. Nature of the Misconduct

 We first consider the nature of Harrigan's misconduct, which includes misappropriation of client funds, misrepresentations to clients, and failure to cooperate with a disciplinary investigation. Misappropriation of client funds occurs "whenever the funds are not kept in trust and are used for a purpose other than one specified by the client." *In re Brooks,* 696 N.W.2d 84, 88 (Minn.2005). The referee found that Harrigan had misappropriated over $106,000 from L.S. and nearly $24,000 from N.W., making the total misappropriated from clients over $130,000. The presumptive punishment for misappropriation of client funds is disbarment, unless there are substantial mitigating circumstances. *In re Jones,* 834 N.W.2d 671, 681 (Minn.2013); *In re Wentzel,* 711 N.W.2d 516, 520–21 (Minn.2006). Harrigan offered no mitigating circumstances.

Misrepresentation is also serious misconduct. We have previously stated that "making misrepresentations demonstrates a lack of honesty and integrity, and warrants severe discipline." *In re Lundeen,* 811 N.W.2d 602, 608 (Minn.2012). Here, the referee found that Harrigan made misrepresentations to L.S. about the existence of a complaint against her in violation of Rule 4.1. Minn. R. Prof. Conduct 4.1 ("In the course of representing a client, a lawyer shall not knowingly make a false state-

ment of fact or law."). Harrigan also failed to cooperate with a disciplinary investigation. We have stated that "noncooperation with the disciplinary process, by itself, may warrant indefinite suspension and, when it exists in connection with other misconduct, noncooperation increases the severity of the disciplinary sanction." *In re Nelson,* 733 N.W.2d 458, 464 (Minn. 2007). Here, the referee found that Harrigan failed to cooperate with the disciplinary proceeding, in violation of Minn. R. Prof. Conduct 8.1 and Rule 25, RLPR, by knowingly making false statements to the Director and failing to respond to lawful demands for information from the OLPR. Thus, the nature of Harrigan's misconduct was very serious, and his lack of cooperation increases the severity of the sanction.

### B. Cumulative Weight of the Disciplinary Violations

 We next consider the cumulative weight of Harrigan's disciplinary violations. "[T]he cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." *In re Oberhauser,* 679 N.W.2d 153, 160 (Minn. 2004). Regarding misappropriation, we have distinguished "a brief lapse in judgment or a single, isolated incident of misappropriation from multiple instances of misappropriation occurring over a substantial amount of time or involving significant amounts of money." *In re Jones,* 834 N.W.2d at 681 (citation omitted) (internal quotation marks omitted); *see also In re Fairbairn,* 802 N.W.2d 734, 743 (Minn. 2011) (stating that six acts of misappropriation totaling $144,000 and two acts of unintentional misappropriation over the course of nearly 13 months were not isolated incidents or a brief lapse in judgment); *In re Rooney,* 709 N.W.2d 263, 269 (Minn.2006) (concluding that 17 instances

of misappropriation totaling $27,700 over a year did not constitute "a single, isolated incident or a brief lapse in judgment"). Harrigan committed three acts of misappropriation over the course of two years, involving amounts totaling over $130,000. This constitutes more than a "brief lapse in judgment" or a "single, isolated incident."

### C. Harm to the Public and the Legal Profession

In determining the proper discipline to impose, we also consider the harm to the public and the legal profession. This includes consideration of "the number of clients harmed and the extent of the clients' injuries." *In re Coleman*, 793 N.W.2d 296, 308 (Minn.2011) (citation omitted) (internal quotation marks omitted). Both L.S. and N.W. suffered serious financial losses because of Harrigan's misconduct. L.S. testified that Harrigan's conduct caused her substantial stress and that she often felt at a loss as to what to do. N.W. also testified that Harrigan's conduct caused her to lose trust in others, which affects her daily life. The referee noted, "What was striking to this referee was the clear testimony of the two women concerning the profound effect this had on both of them beyond the financial loss—psychologically, emotionally and almost physically. It is something that the simple reading of written record cannot convey." The evidence is overwhelming that Harrigan's conduct caused substantial harm to both L.S. and N.W.

Moreover, the misuse of funds "entrusted to an attorney as a fiduciary for his clients is a breach of trust that reflects poorly on the entire legal profession and erodes the public's confidence in lawyers." *In re Rooney*, 709 N.W.2d at 270. The "[m]isappropriation of client funds, by its very nature, harms ... the public at large,

the legal profession, and the administration of justice." *In re Ruttger*, 566 N.W.2d 327, 331 (Minn.1997). In addition, Harrigan's failure to respond to his clients' attempts to contact him about their distributions caused harm to the public and legal profession because it "reflect[ed] adversely on the bar, and [was] destructive of public confidence in the legal profession." *In re Redburn*, 746 N.W.2d 330, 338 (Minn.2008) (citation omitted) (internal quotation marks omitted). Failure to cooperate with the disciplinary investigation also "harm[s] the legal profession by undermining the integrity of the attorney disciplinary system." *In re Ulanowski*, 834 N.W.2d 697, 703 (Minn.2013). Thus, Harrigan's misconduct caused harm not only to his clients, but also to the general public and the legal profession.

### D. Aggravating and Mitigating Circumstances

We also consider aggravating and mitigating circumstances when determining the appropriate discipline for attorney misconduct. Not only has Harrigan offered no evidence of mitigating circumstances, the referee found several aggravating factors. Harrigan has been an attorney since 1981, and we have previously held that substantial experience as a lawyer may constitute an aggravating factor. *In re Rebeau*, 787 N.W.2d at 176. The referee concluded that Harrigan demonstrated a selfish motive, thus aggravating the misconduct. *See In re Garcia*, 792 N.W.2d 434, 443–44 (Minn.2010) (recognizing that an attorney demonstrated selfish or dishonest motives when he misappropriated funds to pay country club fees). An additional aggravating factor is that Harrigan has failed to recognize the wrongful nature of his misconduct, as nothing in the record suggests that Harrigan has expressed remorse or acknowledged the wrongfulness

of his conduct. *See In re Ray,* 610 N.W.2d 342, 347 (Minn.2000) (disbarring lawyer where he did "not acknowledge that he has committed any misconduct, and it appear[ed] that unless appropriately sanctioned, he [was] likely to engage in similar conduct in the future"). Harrigan's indifference to making restitution, as specifically found by the referee, is also an aggravating factor. *See In re Roggeman,* 779 N.W.2d 520, 528 (Minn.2010) (stating that indifference to making restitution can be an aggravating factor).

The vulnerable nature of Harrigan's clients is also an aggravating factor. *See In re Stroble,* 487 N.W.2d 869, 871 (Minn. 1992) (disbarment ordered where lawyer "stole $90,000 from three elderly, vulnerable clients who entrusted respondent with their life savings"). Where "an attorney exhibits callous disregard for the physical and financial well-being of vulnerable, dependent persons, that attorney has a heavy burden to persuade the court of his fitness to continue the practice of law." *See also In re Franke,* 345 N.W.2d 224, 228 (Minn. 1984). *In re Benson,* 431 N.W.2d 120, 124–25 (Minn.1988) (disbarment ordered where lawyer's misconduct was directed at an elderly, dependent person who was a lifelong friend of the lawyer). L.S. was approximately 75 years old and had little to no experience with the legal system, and N.W. was a college student with significant injuries who had recently lost several close family members and had limited experience with the legal system. The referee found that these circumstances made both clients vulnerable, which aggravates Harrigan's misconduct. Thus Harrigan's misconduct is aggravated by several factors, and this influences our determination of the appropriate sanction for his misconduct.

### III.

Based on the substantial amount of money misappropriated, the misrepresen-

tations about this misappropriation, the failure to cooperate with the disciplinary investigation, and the several aggravating factors including the vulnerable nature of Harrigan's clients, the lack of restitution or acknowledgment of wrongdoing, and Harrigan's selfish and dishonest motive, we conclude that disbarment is the appropriate discipline in this case. We therefore order that:

1. Respondent Thomas G. Harrigan is disbarred in the State of Minnesota, effective upon the date of the filing of this opinion;

2. Harrigan shall comply with Rule 26, RLPR (requiring notice of disbarment to clients, opposing counsel, and tribunals); and

3. Harrigan shall pay to the Director the sum of $900 in costs and disbursements pursuant to Rule 24, RLPR.

Disbarred.