**In re Petition for DISCIPLINARY ACTION AGAINST William P. KASZYNSKI, an Attorney at Law of the State of Minnesota.**

No. C4–99–1780.

Supreme Court of Minnesota.

Jan. 11, 2001.

Edward J. Cleary, Director, Betty M. Shaw, Senior Assistant Director, Office of Lawyers Professional Responsibilty, St. Paul, MN, for appellant.

William P. Kaszynski, St. Paul, MN, for respondent.

## OPINION

PER CURIAM

The Director of the Office of Lawyers Professional Responsibility served and filed a petition for disciplinary action against William P. Kaszynski on October 15, 1999. Two separate supplementary petitions for disciplinary action were served and filed on November 4, 1999, and February 22, 2000. The allegations set forth in the petitions arose primarily from 24 client files and included false advertising, neglect of client matters, incompetence, failure to communicate with clients, trust account violations, and failure to cooperate with the disciplinary process. The case was assigned to Referee Randall J. Slieter, and a hearing was held on March 21 and 22, 2000. Kaszynski did not appear for the proceedings.

On June 1, 2000, Referee Slieter served and filed his findings, conclusions and recommendation. The referee concluded that Kaszynski violated multiple Minnesota Rules of Professional Conduct in his repre-

sentation of clients in immigration matters and recommended that Kaszynski be disbarred. Because Kaszynski did not order a transcript of the proceedings, the referee's findings of fact and conclusions are conclusive pursuant to Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). The only issue before us, therefore, is the appropriate discipline to be imposed. We conclude that the facts and circumstances of this case warrant disbarment.

Kaszynski was admitted to practice law in Minnesota on May 22, 1981, and his prior disciplinary history includes only one unrelated private admonition in 1991. The conduct that is the subject of this proceeding began in July 1996, when Kaszynski began representing clients in immigration matters. Although Kaszynski had no experience or training in immigration law, a client, Juan Olivetti, offered to refer individuals from the Hispanic community to Kaszynski for immigration law assistance. Olivetti claimed that he was very familiar with immigration law from previous employment as a translator and legal assistant. Further, Olivetti told Kaszynski that immigration law was primarily a matter of filling out forms and making a few appearances. Kaszynski agreed to accept clients referred by Olivetti and sought other sources of immigration law clients.

From 1996 through 1999, Kaszynski represented numerous individuals in immigration matters. The bulk of the referee's findings and conclusions detail 24 cases during this time period where Kaszynski and his employees harmed clients through incompetence, mishandling of client matters, neglect, lack of diligence, noncommunication, and excessive fees. The referee concluded this conduct violated Minn.R.Prof.Conduct 1.1, 1.3, 1.4, 1 .5, and 3.1.

Kaszynski did not have even a basic knowledge of immigration law and procedures, and his representation threatened the immigration status of several clients. A primary area of Kaszynski's immigration work was seeking permanent resident status for illegal aliens, and from September 1996 through March 1997, Kaszynski submitted dozens of processing requests to the Immigration and Naturalization Service (INS). The decision to submit a processing request is crucial, because it alerts the INS to an alien's presence in the country and places an alien into deportation proceedings. Once in deportation proceedings, deportation is avoided at the discretion of the immigration court.

Despite the importance of these processing requests, the vast majority of the initial requests sent by Kaszynski to the INS were returned for insufficient information and other deficiencies. Kaszynski often sent the INS little more than the bare application, failing to supply any documentation of factors that must be proven to obtain the relief sought by his clients. For instance, in one family's case, Kaszynski failed to provide hardship documentation regarding the mother's diabetes and the daughter's United States citizenship which might have enabled the family to establish permanent resident status. These inadequacies persisted despite communication from the INS explaining how to correct the problems. In addition, INS attorneys testified that Kaszynski was frequently unprepared for immigration hearings and failed to adequately prepare his clients for their hearings.

Kaszynski's incompetence in immigration law matters is also vividly illustrated by his failure to understand and accurately communicate to his clients and employees the changes in the procedure and requirements leading to legal permanent residency that became effective April 1, 1997. Prior to April 1, 1997, an illegal alien in deportation proceedings could apply to have his or her status adjusted to that of an alien lawfully admitted for permanent residency through the discretionary remedy of "suspension of deportation." 8 U.S.C. § 1254 (1994) (repealed 1996). The minimum requirements for suspension of deportation included good moral character,

a minimum of seven years of continuous presence in the United States, and extreme hardship to the alien. *See id.*

Effective April 1, 1997, suspension of deportation was replaced with a new discretionary remedy referred to as "cancellation of removal." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, § 304(a)(3), 110 Stat. 3009–594 (1996), *codified at* 8 U.S.C. § 1229b (2000); § 308(b)(7), 110 Stat. 3009–615 (1996) (repealing 8 U.S.C. § 1254). The minimum standards for cancellation of removal are more difficult to meet and include good moral character, at least ten years of continuous presence, and "exceptional and extremely unusual hardship" for the applicant's parent, child, or spouse, who is a United States citizen or permanent resident. *See* 8 U.S.C. § 1229b(b)(1) (2000). Both procedures required that the INS complete a processing interview prior to placing an individual formally into deportation proceedings. Unless an individual was officially in suspension of deportation proceedings prior to April 1, 1997, the new requirements would apply.

Kaszynski's ineptitude with respect to this law change had a devastating effect on several clients. For example, Gilberto and Liliana Robles sought Kaszynski's assistance to obtain work permits and eventually become permanent residents of the United States. In December 1996, Kaszynski submitted processing requests to initiate deportation proceedings for the Robles. The timing of these requests was crucial, because the Robles met the seven year continuous presence requirement for suspension of deportation under the old law, but fell short of the necessary ten years of continuous presence for a cancellation of removal under the new law. Kaszynski and the Robles hoped to meet the deadline for suspension of deportation; however, there was a minimum wait of four to six months before a processing interview would be granted. Given this delay, it was unlikely the INS would conduct processing interviews in time for the old law to apply, absent compelling humanitarian circumstances for expediting their requests.

When approached by the Robles for legal assistance, Kaszynski failed to adequately explain that, if suspension of deportation or cancellation of removal were not granted, the Robles would face certain deportation and loss of the years of continuous presence they had accrued. Furthermore, the Robles' applications failed to set forth humanitarian reasons, such as hardship to their United States-born child, that might have sped the process so that the old law would apply. In sum, Kaszynski's office mishandled the Robles' case putting them in jeopardy of being deported.

In these cases and several others, Kaszynski or his employees promised clients impossible results and failed to explain the risks of initiating certain procedures. In addition, many clients paid for work that was never done, was done incorrectly, or was unnecessary and futile. When asked to return attorney fees for work not performed, Kaszynski often refused or refunded less than was due. In addition, Kaszynski continually failed to return clients' phone calls and to keep clients reasonably apprised of proceedings.

Kaszynski's misconduct also included making misrepresentations to the public, his clients, and the INS. Many of Kaszynski's clients came to him in response to advertisements placed in *La Prensa*, a bilingual newspaper serving the Twin Cities' Hispanic community. The ads said "we speak Spanish" and falsely stated that Kaszynski's office had lawyers with 16 years of immigration law experience. When the ads were placed, Olivetti, who became Kaszynski's legal assistant in October 1996, was the only person in the office who spoke Spanish. More importantly, Kaszynski was the only attorney in the firm at that time and had no immigration law experience. The referee concluded that Kaszynski's false advertisements violated Minn.R.Prof.Conduct 7.1 and 7.4. In

addition, the referee found that Kaszynski and his employees made numerous oral and written misrepresentations to clients and the INS in violation of Minn.R.Prof.Conduct 1.1, 1.3, and 3.1.

The referee also concluded that Kaszynski failed to adequately train and supervise Olivetti in violation of Minn.R.Prof.Conduct 5.5 and 5.3. Kaszynski gave Olivetti unsupervised responsibility for client files and allowed Olivetti to interview clients, advise Kaszynski on fees, legal remedies and procedures, complete INS forms, and have ongoing oral and written communications with clients. This lack of supervision enabled Olivetti to hold himself out as an attorney and dispense legal advice. Kaszynski's misconduct also enabled Olivetti to steal clients' money by forging trust account checks and client money orders. Although Kaszynski discharged Olivetti in May 1997, under Minn.R.Prof.Conduct 5.3, Kaszynski is responsible for the considerable damage Olivetti caused to his clients.

Additionally, Kaszynski failed to adequately train and supervise an inexperienced associate he hired in May 1997. Not only did Kaszynski fail to ensure that his subordinate attorney was competent to practice immigration law, Kaszynski gave the associate misinformation about the applicability of the April 1, 1997 change to removal procedures. The referee concluded this misconduct violated Minn.R.Prof.Conduct 5.1.

In addition to Kaszynski's demonstrated incompetence and misrepresentations, the referee found misconduct in Kaszynski's financial matters. Kaszynski failed to remit federal employer withholding taxes for seven quarters in 1997, 1998, and 1999, and state employer withholding taxes for two of those quarters, in violation of Minn.R.Prof.Conduct 8.4(b) and (d). An audit of Kaszynski's trust account records and documents for the period of June 1996 through December 1997, revealed shortages and deficiencies. Kaszynski failed to perform required trust account trial balances and reconciliations. Kaszynski's trust account balance was continuously less than required to cover client account balances, with shortages up to $5,771. This improper trust account maintenance prevented Kaszynski from discovering Olivetti's misappropriation and other problems. In addition, checks and money orders payable to the INS were placed in unsecured client files for long periods of time. From these facts, the referee concluded that Kaszynski violated multiple trust account rules and failed to safeguard client property in violation of Minn.R.Prof.Conduct 8.4(c) and 1.15.

The referee also found that Kaszynski failed to cooperate with the disciplinary process. For instance, Kaszynski did not make a meaningful response to the Director's January 7, 2000 interrogatories and requests for admissions and did not cooperate with prehearing directives to communicate with the Director's Office regarding witnesses, exhibits, and settlement positions. In addition, Kaszynski did not appear for the scheduled hearing on March 21, 2000.

Also conclusive are the referee's findings of relevant aggravating factors. Throughout these proceedings, Kaszynski refused to acknowledge the wrongful nature of his actions, instead portraying himself as a victim and repeatedly casting blame on others. The severity of Kaszynski's misconduct is further aggravated by the vulnerability of Kaszynski's clients. Most clients did not speak or read the English language, were unfamiliar with immigration procedures, and were extremely dependent on Kaszynski in their legal proceedings. Kaszynski charged excessive fees that represented several weeks' or even months' worth of wages for many of these clients. Furthermore, Kaszynski was indifferent to making restitution to aggrieved clients and named 325 clients as potential creditors in a bankruptcy petition, seeking to discharge any claims that might be brought against him by these individuals.

In addition the referee noted that, as an attorney with 15 years of practice, Kaszynski should have been mindful of his professional responsibilities. Citing Kaszynski's multitude of gross violations and the resulting harm to the public and the legal profession, the referee recommended disbarment.

■ Because the referee's findings and conclusions are deemed conclusive under Rule 14(e), RLPR, the only issue before us is the appropriate discipline for Kaszynski's violations. While great weight will be afforded to the referee's recommendation, this court retains the "ultimate responsibility for determining the proper discipline." *In re Klein*, 609 N.W.2d 230, 233 (Minn.2000). "The purpose of attorney discipline is not to punish the attorney, but rather to protect the courts, the public and the legal profession, as well as to guard the administration of justice." *In re Madsen*, 426 N.W.2d 434, 435 (Minn.1988). In deciding the appropriate discipline, we will consider the nature of the misconduct, the cumulative weight of the rule violations, and the resulting harm to the public and to the legal profession. *See In re Orren*, 590 N.W.2d 127, 129 (Minn.1999). In addition, we will consider any mitigating or aggravating circumstances. *See In re Heffernan*, 351 N.W.2d 13, 14 (Minn.1984). While prior decisions provide guidance and aid in enforcing consistent discipline, "each case is unique and must be examined on its own facts." *In re Dvorak*, 554 N.W.2d 399, 403 (Minn.1996).

■ The referee considered Kaszynski's pattern of misconduct and recommended disbarment. Disbarment is the most serious sanction, and this court will "generally require a continuing pattern of serious professional misconduct before disbarring an attorney." *In re Isaacs*, 451 N.W.2d 209, 212 (Minn.1990). When warranted, however, this court will "not hesitate to impose the strictest discipline available, including disbarment, in order to maintain public confidence in the legal pro-

fession." *In re Dovolis*, 572 N.W.2d 734, 736 (Minn.1998).

■ The record here shows a three-year pattern of incompetence and mishandling and neglect of client matters, in addition to trust account improprieties, misrepresentations, and other repeated violations of Kaszynski's duty to his clients and the public. We have disbarred attorneys in similar cases of serious and egregious misconduct, including extreme client neglect and noncommunication. *See, e.g., In re Weyhrich*, 339 N.W.2d 274, 279 (Minn. 1983) (ordering disbarment for gross neglect, noncommunication, unexcused absences from scheduled court appearances, and noncooperation); *In re Braggans*, 280 N.W.2d 34, 35 (Minn.1979) (disbarring attorney for neglect of several client matters with no mitigating circumstances).

Furthermore, neglect, noncommunication, and mishandling of client matters were not the sum total of Kaszynski's misconduct. We have resorted to disbarment where neglect of client matters is combined with other disciplinary violations. For instance, in *In re Harp*, 560 N.W.2d 696, 698 n. 1 (Minn.1997), we disbarred an attorney for continuing patterns of serious misconduct including client neglect and noncommunication, evidenced by such behavior as misrepresentations to clients and failure to file a timely appeal. Like Kaszynski, Harp also committed multiple trust account violations, failed to file employee withholding tax returns, refused to return unearned fees, and declined to cooperate with the disciplinary process. *See id.* While the attorney's prior disciplinary history for related violations was a consideration in *Harp*, we have never held that prior discipline is required before an attorney will be disbarred. Here, the pervasiveness and severity of Kaszynski's misconduct warrants disbarment.

Similarly, Kaszynski's misconduct is equivalent to the misconduct warranting disbarment in *In re Jones*, 383 N.W.2d 303, 305–06 (Minn.1986). In *Jones*, the

attorney neglected client matters and failed to take responsibility for errors when brought to her attention. *Id.* In addition, Jones eschewed her professional responsibility by filing fraudulent lawsuits, lying to clients, lying under oath, and failing to cooperate in the disciplinary proceedings. *See id.* As in these cases, the "cumulative weight and severity" of Kaszynski's disciplinary rule violations compel disbarment.

Likewise, the resulting harm to Kaszynski's clients warrants disbarment. Kaszynski's representation threatened the immigration status of many of his clients and "contravened one of the most fundamental concepts of his profession: that he should represent his clients competently and zealously, without prejudice or damage to those clients." *In re Franke,* 345 N.W.2d 224, 228 (Minn.1984) (ordering disbarment for a pattern of misconduct including self-dealing, intentional harm to two wards, client neglect, misrepresentations, excessive fees, conflict of interest, and the unauthorized practice of law). Kaszynski's misconduct had a significant adverse impact on the lives of many of his clients, separating families, and threatening the ability of clients to obtain permanent residency status. We do not allow attorneys who display such a "callous disregard for the physical and financial well-being of vulnerable, dependent persons" to continue the practice of law. *Id.*

Kaszynski's extensive and pervasive pattern of misconduct, aggravated by factors such as dishonesty and selfish motives, the vulnerability of his clients, and his continued refusal to acknowledge his fault and accept responsibility for his actions compel the conclusion that disbarment is the only appropriate discipline. Accordingly, we order that:

1. Respondent William P. Kaszynski is hereby disbarred from the practice of law, effective immediately.

2. Kaszynski shall comply with the requirements of Rule 26, RLPR in providing notice to clients, parties, and tribunals, delivering clients' papers and property, and providing proof of compliance to the Director.

3. Kaszynski shall pay to the Director the sum of $900 in costs and disbursements pursuant to Rule 24, RLPR.

So ordered.