In re Petition for DISCIPLINARY AC-TION AGAINST Joseph Awah FRU, a Minnesota Attorney, Registration No. 342154.

No. A11–1693.

Supreme Court of Minnesota.

April 24, 2013.

Martin A. Cole, Director, Siama Y. Chaudhary, Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, MN, for petitioner.

Michael McGlennen, Minneapolis, MN, for respondent.

## OPINION

PER CURIAM.

On September 21, 2011, the Director of the Office of Lawyers Professional Responsibility ("OLPR") filed a petition for disciplinary action against Joseph Awah Fru, a lawyer duly licensed to practice law in the State of Minnesota. The petition alleged that over an 8–year period, Fru engaged in several acts of professional misconduct in his representation of clients in immigration matters and in an unemployment case. The alleged misconduct included a persistent and pervasive pattern of incompetence, client neglect, and noncommunication. Following a hearing on the petition, a referee appointed by our court to hear this matter recommended that Fru be indefinitely suspended from the practice of law and ineligible to peti-

tion for reinstatement for a minimum period of 2 years. Because Fru did not order a transcript of the proceedings, the referee's findings of fact and conclusions of law are deemed conclusive. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). Therefore, the only issue before our court is the appropriate discipline to impose. We suspend Fru from the practice of law for a minimum period of 2 years.

Joseph Awah Fru was admitted to the practice of law in Minnesota on November 17, 2004. He has not been the subject of any prior discipline, but the misconduct at issue persisted over most of the years he has practiced law and involved several different matters. We summarize that misconduct below.

*M.L. and B.M. Matter*

 Fru represented M.L. and B.M. in immigration removal proceedings. M.L. and B.M. were Guatemalan immigrants who were married to each other and were seeking asylum in the United States. M.L. and B.M. filed applications (collectively, "the application") opposing removal from the United States based on various provisions of the Immigration and Nationality Act and Article 3 of the Convention Against Torture. On September 9, 2005, Fru appeared with M.L. and B.M. at a master calendar hearing in Immigration Court on the removal matter. The Immigration Court issued an order continuing M.L.'s and B.M.'s removal proceedings to September 13, 2006. The order required M.L. and B.M. to comply with certain due dates and adhere to the local operating procedures of the Immigration Court. It also obliged M.L. to turn over his recently expired passport to the Immigration Court within 60 days of receiving a new passport.

Fru failed to comply with the Immigration Court's order requiring M.L. and B.M. to meet deadlines and follow local operating procedures. For instance, M.L. received a new passport on September 19, 2005. Fru instructed M.L. to leave the old passport at his office and told M.L. that he would turn the passport over to the Immigration Court. Fru failed to do so until September 13, 2006, nearly 1 year after he received the passport from M.L. and 10 months after the Immigration Court's deadline.

Local operating procedures in the Immigration Court also required that, 10 days before the hearing, M.L. and B.M. had to file all documents in support of the application. But Fru failed to file the primary supporting documents—which included a legal memorandum, affidavits, country information, and a witness list—until September 11, 2006, which was 2 days before the removal hearing. Moreover, the Immigration Court excluded from evidence several Spanish-language affidavits that Fru had instructed M.L. to translate and certify himself. The Immigration Court excluded the affidavits from evidence in part because they were untimely, but also because M.L., a party to the removal proceedings, prepared them.

On November 1, 2006, the Immigration Court denied the application and ordered M.L. and B.M. to depart voluntarily from the United States on or by January 1, 2007. The Immigration Court also required M.L. and B.M. to deposit a $1,000 departure bond with the Department of Homeland Security within 5 business days of the court's order. Fru failed to inform M.L. and B.M. of the court's decision and order. M.L. only learned that the Immigration Court had issued an order after contacting the court himself. By that time, the deadline to deposit a voluntary departure bond had passed.

Fru's contact with M.L. and B.M. throughout the representation was sporadic. Between October 2005 and May 2006,

Fru failed to respond to any of M.L.'s phone calls requesting guidance or a status update. After a brief meeting in late May 2006, Fru again failed to respond to any of M.L.'s phone calls until August 25, 2006. In the weeks leading up to the removal hearing, Fru did not attend a scheduled meeting with M.L. and B.M. on September 7, 2006, and again failed to timely respond to M.L.'s phone calls. Finally, after M.L. and B.M. terminated Fru's representation in November 2006, Fru failed to return their file until the spring of 2007.

*G.D. Matter*

In March 2008, G.D. retained Fru to represent him in an unemployment compensation insurance matter. At the time, Fru was working full time as an assistant public defender in Rochester, Minnesota. Fru and G.D. never entered into a written retainer agreement. G.D. provided Fru with original documents and paid him a total of $2,000 for the representation. He did so by writing two personal checks for $500 and $1,500, respectively. Fru did not deposit the checks in a trust account. Rather, Fru signed the checks over to Jennifer Walton, a supervisor at the group home where Fru worked part-time on the weekends. Walton was not affiliated with Fru's law practice.

Fru took no action regarding the G.D. matter, and G.D. tried to contact Fru several times to no avail. Eventually, G.D. retained another attorney to help him recover both the original documents that he provided to Fru and a refund of the retainer paid to Fru. Fru did not refund G.D.'s $2,000 until July 14, 2008, and failed to return G.D.'s documents until October 28, 2009. The attorney G.D. hired to recover his money and documents from Fru charged G.D. $650 for collecting the $2,000 from Fru and recovering the documents.

*F.K. Matter*

On November 3, 2008, the United States Citizenship and Immigration Services ("USCIS") notified F.K. of its intent to terminate his asylum status. USCIS scheduled a termination interview for December 4, 2008. F.K. retained Fru to represent him in the termination proceedings. F.K. paid Fru $700 for the representation. Fru did not enter into a written retainer agreement with F.K. and did not deposit the fee into a trust account.

Two days before the termination interview, Fru informed F.K. that he had a scheduling conflict. USCIS granted F.K.'s request for a continuance and rescheduled the termination interview for April 16, 2009. F.K. paid Fru an additional $300 for the representation after Fru assured him that he could appear at the April 16 termination interview. Another scheduling conflict prevented Fru from appearing. Fru learned of the conflict in early April, but he did not inform F.K. of the conflict until the day before the termination interview—even though he met with F.K. on April 11.

When F.K. learned that Fru would not attend the interview, F.K. requested that Fru return his file. Fru ignored the request. With only a day's notice, F.K. managed to obtain substitute counsel to represent him. Without F.K.'s knowledge or consent, however, Fru arranged for another attorney to appear at the termination interview in Fru's place. The replacement attorney was late to the interview and disrupted the proceedings. F.K. emailed Fru multiple times in the weeks following the April 16 termination interview in an attempt to recover his file. Fru did not respond to F.K. until May 7, 2009, and did not return F.K.'s file until May 12, 2009.

*Presbyterian Homes and Services Matters*

In 1999, Presbyterian Homes and Services ("Presbyterian Homes"), which provides housing and services for senior

citizens, established a religious worker program. Fru, who was employed by Presbyterian Homes before he was admitted to practice law, recruited religious elders from Cameroon as part of that program. Upon his graduation from law school, Fru represented Presbyterian Homes and several of the religious elders that he had recruited in immigration proceedings. Three of those representations are relevant to this disciplinary action.

### 1. M.C. Matter

In 2002, Fru recruited M.C., a religious elder from Cameroon, on behalf of Presbyterian Homes. M.C. gained entry to the United States by obtaining a temporary religious worker visa ("R–1 visa").[1] In January 2006, M.C. retained Fru to (1) file an asylum application for him and (2) reopen a prior denial of an extension request of M.C.'s temporary religious worker visa. M.C. paid Fru $1,500 to represent him in the two matters. M.C. agreed to pay Fru an additional $4,000 to file a special immigrant visa petition on his behalf. The petition—also known as an I–360 ("the I–360 petition")—provides a pathway for a nonimmigrant religious worker to obtain permanent residency in the United States. Fru charged M.C. $1,500 to file the I–360 petition and retained the $2,500 balance of

the funds. If USCIS granted M.C.'s I–360 petition, Fru agreed to file an application—also known as an I–485 ("the I–485 petition")—to adjust M.C.'s immigration status from alien to permanent resident. If USCIS denied M.C.'s I–360 petition, then M.C. agreed to pay Fru an additional $500 to proceed with his asylum application.[2]

Fru filed the I–360 petition on January 16, 2007. On March 26, 2008, USCIS notified Fru that it intended to deny the petition. The deadline for Presbyterian Homes and M.C. to respond to the notice of intent to deny was April 25, 2008, and Fru did not timely respond. On May 16, 2008, USCIS denied the petition. The notice of decision informed Fru that Presbyterian Homes had 30 days from the date of decision to appeal. M.C. learned from Presbyterian Homes that his I–360 petition was denied because Fru never told him about the denial. Nevertheless, upon learning of the denial, M.C. asked Fru to prepare an appeal. Fru led both M.C. and Presbyterian Homes to believe that he appealed USCIS's denial of the I–360 petition. He never did so.

On March 9, 2009, Fru appeared with M.C. at a hearing in Immigration Court. Fru sought a continuance of the removal

---

1. An alien who comes to the United States to work, at least part time, for a non-profit religious organization as a minister or in a religious occupation or vocation may obtain an "R–1 visa" for a maximum period of five years. See generally National Immigration Project of the National Lawyers Guild, *Immigration Law and Defense* § 3:126 (4th ed.2013).

2. Special nonimmigrant religious workers and sponsor organizations typically pursue permanent residence in the United States by first filing an I–360 petition, and then filing an I–485 petition. As one leading treatise on immigration law explains:

[A]n organization seeking the services of a minister of religion or religious worker may file a petition on Form I–360. . . . As part of the petition, the organization must document that the beneficiary has been engaged for at least two years as a minister of religion or in another qualifying religious occupation. The petitioner must also establish that the beneficiary seeks to enter the United States solely to work for the petitioner and must present documentation that it has need of the alien's services. If the I–360 petition is approved and the alien is in the United States, an Application for Adjustment of Status (Form I–485) may be filed. National Immigration Project of the National Lawyers Guild, *supra*, § 4:34.

proceedings to allow M.C. to marry T.M.B., a lawful permanent resident of the United States and M.C.'s fiancée at the time, because T.M.B. had allegedly agreed to file an I–130 petition on M.C.'s behalf after the couple procured a marriage license.[3] The Immigration Court granted the continuance based on M.C.'s agreement to withdraw his asylum application with prejudice. The written withdrawal of M.C.'s asylum application allowed him to pursue only two avenues of relief from removal: (1) T.M.B.'s I–130 petition and (2) the I–360 petition. The deadline for the submission of the I–130 petition was November 12, 2009.

During the course of M.C.'s removal proceedings, Fru made a series of misrepresentations to the Immigration Court about the status of M.C.'s I–360 petition. For instance, the written withdrawal of relief submitted by M.C. and signed by Fru stated, in relevant part, that it did "*not* withdraw any relief [M.C.] may be entitled to based on [his] pending special immigrant petition as a religious worker (Form I–360)." M.C.'s I–360 petition was not pending, however, because USCIS had already denied it and Fru had never appealed that denial. When the Immigration Court confronted Fru about the discrepan-

cy at a subsequent hearing, Fru falsely claimed that "the minutes" of the March 9, 2009 hearing would reflect the fact that he said a motion to reopen the I–360 petition was pending—not the original petition itself. But Fru had never filed a motion to reopen the I–360 petition, and he never told the Immigration Court at the March 9, 2009 hearing that a motion to reopen the I–360 petition was pending.

On September 8, 2009, M.C. obtained substitute counsel because Fru had repeatedly failed to respond to his request to file the I–485 application. Unable to contact Fru, M.C. filed the I–485 application by himself without the benefit of his file. USCIS rejected the application. M.C. wanted to file the I–485 application based on his mistaken belief that Fru had appealed the denial of his I–360 petition, and because he believed that he would benefit from a recent change in USCIS regulations.[4]

On September 9, 2009, M.C.'s new counsel made a written request that Fru turn over M.C.'s file. Fru did not turn over M.C.'s file to his new counsel until November 7, 2009—approximately 2 months after the written request. Eventually, M.C.'s new counsel learned that Fru had never

---

3. Under federal law, "[a] United States citizen who wishes to obtain permanent residence for a spouse files a petition on Form I–130." National Immigration Project of the National Lawyers Guild, *supra*, § 4:39. The petitioning spouse must provide supporting documentation to prove that the marriage is bona fide, including a certified copy of the record of marriage and proof of United States citizenship. *Id.*

4. In *Ruiz–Diaz v. United States*, a federal district court held that a regulation prohibiting special immigrant religious workers from filing an application for adjustment of status until their visa petitions had been approved was invalid. *See Ruiz–Diaz v. United States*, 618 F.3d 1055, 1057–58 (9th Cir.2010), *rev'g* No. C07–1881RSL, 2009 WL 799683

(W.D.Wash. Mar. 23, 2009). The Ninth Circuit reversed, concluding that the regulation was a permissible construction of the adjustment of status statute. *Id.* at 1062. After the district court's decision, but before the Ninth Circuit's reversal, USCIS permitted individuals with I–360 petitions pending since January 2007 to file an I–485 application by September 9, 2009. Because Fru had not timely filed an appeal of USCIS's denial of the I–360 petition, M.C. was not eligible to file an I–485 application. However, if Fru had properly appealed USCIS's denial of the I–360 petition, the referee found that M.C. would have been protected "from the accrual of unlawful presence and unauthorized work until September 9, 2009."

appealed the denial of the I–360 petition, and therefore M.C. was never eligible to submit the I–485 application for adjustment of status to permanent resident of the United States.

The referee summarized Fru's testimony at the disciplinary hearing. According to the referee, Fru claimed that "M.C. had allegedly married his own sister to bring her to the United States and that . . . [Fru] advised M.C. to withdraw the asylum application so that he would not face a permanent ban from returning to the United States if the fraud was discovered." The referee also found that Fru later admitted that he "knew of the allegedly fraudulent marriage in May 2006, the time of retention in the asylum matter," yet he continued to represent M.C. until May 2009. The referee found that Fru's "conduct and testimony in this regard is not credible, and demonstrates a lack of recognition of the wrongful nature of his conduct and lack of remorse for his misconduct."

### 2. G.A. Matter

Fru recruited G.A. as part of Presbyterian Homes' religious worker program. Like M.C., G.A. was admitted to the United States under an R–1 visa. G.A.'s visa authorized him to work in the United States until November 2004. Presbyterian Homes, on behalf of G.A., filed two I–360 petitions, which USCIS denied on December 16, 2003, and February 25, 2005, respectively. USCIS then denied G.A.'s motion to reconsider the denial of his second I–360 petition on July 22, 2005. Presbyterian Homes and G.A. subsequently retained Fru to file a second motion to reconsider USCIS's denial of the second I–360 petition. G.A. paid Fru a total of $650 for the representation.

On November 15, 2005, Fru filed a joint motion to reconsider the denials of the I–360 petitions of five Presbyterian Homes' religious workers, including G.A. USCIS issued a notice confirming receipt and processing of the motion on behalf of E.N.— one of the five joint petitioners. Fru erroneously used E.N.'s receipt notice to assure both Presbyterian Homes and G.A. that a motion to reconsider USCIS's denial of the second I–360 petition was pending. But federal immigration law requires each beneficiary of a filing to receive his own receipt notice and number, and therefore G.A.'s appeal was never perfected. For several years following the purported filing of the appeal, however, Fru represented to G.A. that the motion to reconsider the denial of his second I–360 petition was pending.

An employment verification audit conducted by Presbyterian Homes in July 2009 raised concerns over whether G.A.'s R–1 visa had expired. In a letter dated August 3, 2009, Fru advised Presbyterian Homes that G.A. was "legally permitted to continue working for [Presbyterian Homes] until the final adjudication of his I–360 Petition." Presbyterian Homes still requested that G.A. provide documentation from USCIS verifying that he was legally authorized to work in the United States. G.A. requested that documentation from Fru, but Fru could not provide Presbyterian Homes or G.A. with the documentation for two reasons. First, the mere filing of a motion to reconsider the denial of a I–360 petition does not permit an unauthorized alien to work legally in the United States. As noted above, G.A.'s R–1 visa and his corresponding authorization to work in the United States expired in November 2004. Second, G.A.'s I–360 petition was not pending because Fru had not perfected the appeal. Presbyterian Homes terminated G.A.'s employment. The referee found that Fru had not "competently represent[ed]" G.A., which resulted in G.A. "being employed without authorization for

several years and resulted in his inability to adjust to permanent status."

Presbyterian Homes subsequently retained new counsel to review G.A.'s file. G.A.'s new counsel requested G.A.'s file from Fru on August 17, 2009. Fru did not turn the file over to G.A.'s new counsel until November 7, 2009.

### 3. B.N. Matter

In January 2002, Fru recruited B.N. to come to the United States through Presbyterian Homes' religious worker program. Fru represented Presbyterian Homes and B.N. in immigration-related matters after Fru was admitted to the practice of law in Minnesota. B.N. was responsible for the fees associated with the representation.

In 2004, B.N. asked Fru to (1) file for an extension of his R–1 visa and (2) file an I–360 petition. Fru successfully obtained an extension of B.N.'s R–1 visa, but subsequently failed to notify him when the extension expired in January 2007. On March 26, 2008, USCIS issued a notice of intent to deny B.N.'s I–360 petition, and Fru failed to timely respond to the notice. On July 24, 2008, USCIS denied B.N.'s I–360 petition, and B.N. asked Fru to appeal. Fru falsely advised both Presbyterian Homes and B.N. that he had appealed the denial of the I–360 petition.

As in the G.A. matter, an employment verification audit conducted by Presbyterian Homes in July 2009 raised concerns over the legality of B.N.'s work authorization. Again, like the G.A. matter, Fru erroneously advised both Presbyterian Homes and B.N. that B.N. was eligible to work in the United States while the appeal of the denial of the I–360 petition was pending. Beyond Fru's erroneous legal advice, he continued to falsely advise Presbyterian Homes and B.N. that an appeal of the denial of the I–360 petition was pending. The referee found that as a result of Fru's misconduct, B.N. was "out of work

status and ineligible to apply for adjustment of status to permanent residency," terminated from his employment by Presbyterian Homes, and barred from reentering the United States for 10 years for overstaying his R–1 visa.

Presbyterian Homes retained new counsel to review B.N.'s file. As in the M.C. matter, B.N.'s new counsel requested B.N.'s file from Fru, but Fru failed to turn the file over until November 7, 2009—3 months after the initial request.

### D.M. Matter

In December 2009, D.M., a Florida resident, retained Fru to appeal the Board of Immigration Appeals' ("BIA") denial of his application for political asylum. D.M. and Fru signed a written retainer agreement on January 27, 2010. The retainer agreement called for a $5,000 nonrefundable flat fee that would "be deposited in the Firm's business account and will be considered earned as [sic] attorney upon deposit." On December 11, 2009—before signing the retainer agreement—D.M. paid Fru $3,000 in attorney fees; but Fru did not deposit those funds into a trust account.

The BIA dismissed D.M.'s appeal and affirmed USCIS's denial of his application for political asylum. D.M. retained Fru to appeal the BIA's decision to the United States Court of Appeals for the Eleventh Circuit. Fru told D.M. that his fee was $7,000 for the representation and an additional $1,000 to cover the filing fees. The filing deadline for the appeal to the Eleventh Circuit was November 15, 2010. Fru missed the deadline, and on January 14, 2011, the Eleventh Circuit dismissed the appeal. Fru never informed D.M. that the Eleventh Circuit dismissed the appeal; nevertheless, Fru requested that D.M. pay him $3,000—the outstanding balance on the $7,000 retainer. Unaware of the true status of his appeal, D.M. complied with

Fru's request and promptly sent Fru two checks—one for $2,000 on January 14, 2011, and a second for $1,000 on January 28, 2011.

Fru then proceeded to petition for reconsideration of the Eleventh Circuit's dismissal. He did so without D.M.'s knowledge or consent. On March 17, 2011, the Eleventh Circuit denied the petition for reconsideration. Approximately 1 month later, D.M. requested a status update. Fru informed D.M. that the Eleventh Circuit had dismissed the appeal, but did not tell him the reason for the dismissal. Later that same day—after requesting a copy of the dismissal from Fru's assistant—D.M. learned for the first time that the Eleventh Circuit had dismissed the appeal as untimely and that Fru had filed a petition for reconsideration.

*Unauthorized Practice of Law*

On April 9, 2009, we placed Fru on involuntary restricted status for failing to satisfy his Continuing Legal Education ("CLE") requirements. In Minnesota, an attorney is not permitted to engage in the practice of law while on CLE-restricted status. Nevertheless, on April 16, 2009, Fru appeared on behalf of a client in an immigration matter in Arlington, Virginia.

*Procedural History of the Disciplinary Action*

The Director of the OLPR investigated the seven ethics complaints that were filed against Fru and did so over a 3–year period. The investigation culminated in the Director filing and serving a petition for disciplinary action against Fru on September 21, 2011. A hearing was held on March 8, 2012, before a referee appointed by our court. At the hearing, the Director presented the live testimony of M.L. and Steven C. Thal, an immigration law expert. The Director also presented, by agreement of the parties: the affidavit testimony of

M.L., F.K., M.C., G.A., and B.N.; an unsworn complaint signed by G.D.; and the deposition testimony of D.M. Fru testified on his own behalf.

Following the hearing, the referee found that Fru's conduct in the six above matters violated Minn. R. Prof. Conduct 1.1, 1.2(a), 1.3, 1.4, 1.5(a), 1.5(b), 1.15(a), 1.15(c)(2), 1.15(c)(5), 1.16(d), 3.3(a)(1), 3.4(c), 4.1, 8.4(c), and 8.4(d). The referee also found that Fru's failure to cooperate with the Director's disciplinary investigation violated Minn. R. Prof. Conduct 8.1(b) and 8.4(d), and Rule 25, RLPR; and that Fru violated Minn. R. Prof. Conduct 5.5(a) by engaging in the unauthorized practice of law while on CLE-restricted status. Finally, the referee found that Fru's misconduct was aggravated by several factors and that no factors mitigated his misconduct. The referee recommended that Fru be indefinitely suspended from the practice of law and ineligible to petition for reinstatement for a minimum period of 2 years.

I.

█ We deem the referee's findings and conclusions to be conclusive under Rule 14(e), RLPR, because Fru failed to order a transcript of the proceedings. We therefore turn to the appropriate sanction for Fru's professional misconduct. The Director agrees with the referee's recommendation of an indefinite suspension from the practice of law with no right to petition for reinstatement for a minimum period of 2 years. Fru argues that probation—subject to the supervision of an experienced immigration practitioner and the Director's financial oversight—is a more appropriate sanction for his misconduct. Fru claims that at least some of his failures stem from the fact that he was over-

whelmed by working two jobs and by a failing marriage.[5] Alternatively, Fru argues that we should consider a much shorter suspension and significantly earlier reinstatement eligibility.[6]

We afford "great weight" to the referee's recommendation, but our court retains "ultimate responsibility for determining the appropriate sanction." *In re Rebeau*, 787 N.W.2d 168, 173 (Minn.2010). Disciplinary sanctions for professional misconduct are meant "to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *In re Oberhauser*, 679 N.W.2d 153, 159 (Minn. 2004). We consider four factors to determine the appropriate sanction for professional misconduct: "(1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." *In re Murrin*, 821 N.W.2d 195, 207 (Minn.2012) (citation omitted) (internal quotation marks omitted). We also consider aggravating and mitigating circumstances and consult past cases for guidance. *Id.* But we ultimately determine the appropriate sanction for professional misconduct based on the facts of each case. *Id.*

## II.

### A. The Nature of the Misconduct

We first consider the nature of Fru's misconduct. In several matters, over the course of approximately 8 years, Fru engaged in a pattern of incompetence, neglect, and noncommunication. We have said that "[a] continuing pattern of client neglect is serious misconduct often warranting indefinite suspension by itself, and that more extreme cases involving client neglect and failure to communicate with clients may merit disbarment." *In re Rhodes*, 740 N.W.2d 574, 578 (Minn.2007) (citations omitted) (internal quotation marks omitted).

Moreover, Fru's misconduct in his representation of clients in immigration matters placed several of his clients at risk for deportation or removal. We have previously suspended—and even disbarred— lawyers for similar misconduct. For instance, in *In re Muenchrath*, we indefinitely suspended an attorney from the practice of law for neglect, misrepresentation, noncommunication, and noncooperation in two immigration matters. 588 N.W.2d 497, 501–02 (Minn.1999). In *Muenchrath*, we were especially troubled by the misconduct because it threatened two clients with the "most perilous fate" of deportation. *Id.* at 501. Similarly, in *In re Kaszynski*, we

---

**5.** Before the hearing, Fru sought to introduce testimony regarding marital and other alleged personal problems that he claimed affected his psychological condition. The referee received the testimony, over the Director's objection, to preserve it for the record. The referee ultimately sustained the Director's objection that the evidence was untimely. But the referee independently found that "even if [the evidence] were received [it would] be insufficient to support any mitigation."

**6.** Fru also appears to argue that he should not have to prove by clear and convincing evidence that he has undergone a moral change to be eligible for reinstatement. Fru's argument is without merit. As the Director points out, we have repeatedly held that to be eligible for reinstatement, a petitioner must (1) show "he has met the reinstatement conditions we imposed in our suspension order" and (2) " 'must establish by clear and convincing evidence that she or he has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited.' " *In re Mose*, 754 N.W.2d 357, 360 (Minn.2008) (quoting *In re Singer*, 735 N.W.2d 698, 703 (Minn.2007)). Indeed, "moral change is a central focus of the reinstatement inquiry." *Id.*

disbarred an attorney whose misconduct encompassed 24 immigration matters and included client neglect and misrepresentation, failure to communicate with clients, incompetence, trust account violations, false advertising, inadequate supervision of a nonattorney employee and a subordinate attorney, and failure to cooperate with the disciplinary process. 620 N.W.2d 708, 713–14 (Minn.2001). To be sure, Fru's misconduct, while serious, was less widespread than the misconduct in *Kaszynski*: it involved fewer matters and less serious financial improprieties. But we cannot ignore the fact that Fru's misconduct had potentially grave consequences for many of his clients.

We have long emphasized that "[h]onesty and integrity are chief among the virtues the public has a right to expect of lawyers. Any breach of that trust is misconduct of the highest order and warrants severe discipline." *In re Ruffenach,* 486 N.W.2d 387, 391 (Minn.1992). The misconduct here also involves dishonesty. Fru repeatedly lied to several clients, including M.C., G.A., B.N., and D.M. He also misrepresented the status of M.C.'s I–360 petition to the Immigration Court. When the Immigration Court confronted him about the misrepresentation, Fru compounded his initial misrepresentation with another misrepresentation.

In addition to Fru's pattern of incompetence, neglect, and noncommunication, he also engaged in professional misconduct by failing to obey his obligations under the rules of various tribunals, failing to deposit unearned fees into his trust account, failing to enter into written retainer agreements, and engaging in the unauthorized practice of law. We have not hesitated to impose lengthy suspensions when serious client neglect and incompetence is combined with other disciplinary rule violations. *See, e.g., In re Geiger,* 621 N.W.2d

16, 23–24 (Minn.2001) (indefinitely suspending an attorney who engaged in a pattern of client neglect and incompetence, entered into several improper fee agreements, and failed to supervise subordinate attorneys).

Finally, Fru failed to cooperate fully with the Director's disciplinary investigations and the disciplinary process. We have repeatedly stated that "[f]ailure to cooperate with disciplinary authorities is a serious violation that constitutes separate grounds for discipline" and that "[i]n connection with other misconduct, noncooperation increases the severity of the disciplinary sanction." *In re De Rycke,* 707 N.W.2d 370, 375 (Minn.2006) (citation omitted) (internal quotation marks omitted). Here, the Director investigated the seven ethics complaints that were filed against Fru over a 3–year period. During that investigation, Fru repeatedly failed to respond, timely respond, or fully respond to notices of investigation and the Director's requests for information, and continued to engage in professional misconduct in several representations, including the F.K., M.C., G.A., B.N., and D.M. matters.

### B. Cumulative Weight of the Disciplinary Violations

We next consider the cumulative weight of Fru's rule violations. We have said that "the cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." *Oberhauser,* 679 N.W.2d at 160. Here, Fru's misconduct encompasses most of the timeframe of his career as an attorney—from when he was admitted to practice law until his hearing before the referee. Fru's professional misconduct was "not a single, isolated incident or a brief lapse in judgment." *In re*

*Rooney*, 709 N.W.2d 263, 269 (Minn.2006). Rather, Fru's misconduct persisted for an extended period of time and spanned multiple matters. He consistently neglected clients, rendered incompetent legal advice, made misrepresentations, failed to obey the rules of various tribunals, failed to enter into written retainer agreements, and failed to deposit unearned fees into trust accounts. The cumulative weight of Fru's disciplinary violations counsels in favor of a serious sanction for his professional misconduct.

### C. Harm to the Public and Legal Profession

In assessing the harm that Fru's misconduct caused to the public and the legal profession, we consider " 'the number of clients harmed [and] the extent of the clients' injuries.' " *In re Coleman,* 793 N.W.2d 296, 308 (Minn.2011) (quoting *In re Randall,* 562 N.W.2d 679, 683 (Minn. 1997)). Fru's misconduct directly harmed at least eight clients: M.L., B.M., G.D., F.K., M.C., G.A., B.N., and D.M. Moreover, Fru's neglect and misconduct threat-

ened the immigration statuses of M.L., B.M., F.K., M.C., G.A., B.N., and D.M. Fru's wide-ranging misconduct not only harmed those clients, but also harmed the legal profession by undermining the public's trust in the competence, diligence, and integrity of lawyers. *See In re Lundeen,* 811 N.W.2d 602, 609 (Minn.2012).

### D. Aggravating and Mitigating Circumstances

■ The referee found Fru's misconduct was aggravated by several factors, including: (1) Fru's failure to cooperate and obey court rules once the disciplinary proceedings commenced; (2) the "selfish" nature of his misconduct, which was to avoid detection of his mistakes; (3) the intentional nature of Fru's misconduct; (4) the vulnerability of Fru's immigration clients; and (5) Fru's failure to acknowledge the wrongful nature of his conduct, express remorse, or offer any evidence to prove that misconduct had not occurred or that misconduct will not occur in the future.[7] The referee found no mitigating circumstances.[8]

---

7. The referee found that Fru's commission of multiple acts of misconduct over an extended period was an aggravating factor. The referee also found that Fru's misconduct was aggravated because the misconduct covers most of his professional career. In the past, we have said that "[c]omitting multiple acts of misconduct over a long period of time is an aggravating factor." *In re Ulanowski,* 800 N.W.2d 785, 802 (Minn.2011). However, we generally take the fact that an attorney has committed multiple acts of misconduct into account when considering the cumulative weight of an attorney's disciplinary violations. Here, we have already considered the cumulative weight of Fru's misconduct, and therefore we do not rely on either of these factors identified by the referee as aggravating Fru's misconduct because both factors overlap with our consideration of the cumulative weight of Fru's disciplinary violations. *See In re O'Brien,* 809 N.W.2d 463, 466 n. 9 (Minn. 2012) ("We caution referees not to rely on the

same acts ... to support both a finding of attorney misconduct and the existence of an aggravating factor.").

8. As we have already explained, Fru's failure to order a transcript of the proceedings means that the referee's findings and conclusions are conclusive. Rule 14(e), RLPR. Nonetheless, Fru argues that a mitigating factor is the lack of "lasting harm, financial or otherwise," to the clients that he wronged. We disagree. Fru himself appears to recognize that the mere fact some of his clients fared well is not mitigation. More importantly, the referee recognized that "immigration clients may have a strong incentive to fault their former attorney after an unfavorable decision" and closely scrutinized the evidence "to determine whether false claims against [Fru] were made by ... those complainants in the present proceeding as grounds for their appeal or other subsequent proceedings in their immigration matters." The referee

## III.

In sum, Fru's pattern of client neglect, incompetence, and noncommunication—taken together with his other rule violations and the aggravating factors—warrants indefinite suspension from the practice of law. We are particularly troubled by the fact that Fru's misconduct "threatened the immigration status of many of his clients." *Kaszynski*, 620 N.W.2d at 714. Those clients were vulnerable and depended on him to guide them through the complex—and often punitive—maze of federal immigration law. We therefore conclude that the appropriate sanction to be imposed on Fru for his unprofessional conduct is an indefinite suspension from the practice of law for a minimum period of 2 years. Accordingly, we order that:

1. Respondent Joseph Awah Fru is indefinitely suspended from the practice of law, effective 14 days from the date of filing of the opinion, with no right to petition for reinstatement for a minimum of 2 years from the date of the opinion.

2. If Fru seeks reinstatement, he must file a petition for reinstatement pursuant to Rule 18, RLPR.

3. Fru must comply with the requirements of Rule 26, RLPR.

4. Fru must pay to the Director the sum of $900 in costs and disbursements pursuant to Rule 24, RLPR.

So ordered.

found that the complaints in the proceeding, even if "deserving of greater scrutiny," were "credible."